A–92
JOHN R. BUSIK, PLAINTIFF-RESPONDENT, v.
JOSEPH M. LEVINE, DEFENDANT-APPELLANT.

GILMA GIRALDO (BUSIK), PLAINTIFF-RESPONDENT, v.
JOSEPH M. LEVINE, DEFENDANT-APPELLANT.

A–93
DONALD F. FOLEY AND LILLIAN FOLEY, HUSBAND AND WIFE, PLAINTIFFS-RESPONDENTS, v. UNITED ENGINEERS & CONSTRUCTORS, INC. AND PUBLIC SERVICE ELECTRIC AND GAS CO., DEFENDANTS-APPELLANTS.

Argued February 20, 1973—Decided July 6, 1973.

352

*Mr. Richard J. Carroll* argued the cause for appellant Levine (*Mr. Louis J. Pantages,* of counsel; *Messrs. Gleeson, Hansen and Pantages,* attorneys).

*Mr. Donald F. Stevens* argued the cause for appellant United Engineers and Constructors, Inc. (*Messrs. Beggans and Stevens,* attorneys).

*Mr. Dino D. Bliablias* argued the cause for intervenor National Association of Independent Insurers (A–92) (*Mr. Kenneth J. McGuire,* on the brief; *Messrs. Stein, Bliablias and Goldman,* attorneys).

*Mr. Robert S. Johnson* argued the cause for respondent Giraldo (Busik) (*Messrs. Johnson and Johnson,* attorneys; *Mr. Samuel Chiaravalli* appeared for respondent John R. Busik).

*Mr. Patrick D. Conaghan* appeared for respondents Foley (*Mr. Donald D. Campbell,* on the brief).

The opinion of the Court was delivered by

WEINTRAUB, C. J. These cases involve the validity of *R.* 4:42–11(b), adopted on December 21, 1971 and effective on January 31, 1972, which authorizes prejudgment interest in tort actions. The accidents here involved occurred before the rule was adopted, but the cases came to trial after the effective date of the rule. Interest as provided in the rule was included in the judgments. We certified defendants' appeals before they were argued in the Appellate Division.

The principal charge is that prejudgment interest is a matter of "substantive" law and as such beyond the constitutional grant to the Supreme Court of the power to "make rules governing * * * the practice and procedure" in all courts, *Art.* VI, § 2, ¶ 3. Hence, it is argued, we trespassed upon the legislative domain in adopting the rule, in breach of the principle of separation of powers embodied in *Art.*

III, § 1, of the Constitution. The argument is supplemented with the proposition that defendants were thereby deprived of the opportunity to be heard required by due process of law.

The rule was upheld in *Riley v. Savary,* 120 *N. J. Super.* 331 (Law Div. 1972), but that case did not come to us for review.

I

Although it is said with respect to interest on claims that "in this country interest is generally of statutory origin," *Consolidated Police and Firemen's Pension Fund Commission v. City of Passaic,* 23 *N. J.* 645, 653 (1957), the contrary is true in our State. The Legislature has dealt with usury; that is, it has fixed the upper limit of the interest for which an ordinary loan may be made, see *N. J. S. A.* 31:1-1, but there is no statute dealing with interest upon other obligations or claims or with interest upon judgments. The controlling rules have always been and remain judge-made. See *Jersey City v. O'Callaghan,* 41 *N. J. L.* 349, 353–354 (E. & A. 1879) ; *Verree v. Hughes,* 11 *N. J. L.* 91, 92 (Sup. Ct. 1829) ; *Erie Railway Co. v. Ackerson,* 33 *N. J. L.* 33, 36 (Sup. Ct. 1868) ; *Simon v. New Jersey Asphalt and Paving Co.,* 123 *N. J. L.* 232, 234 (Sup. Ct. 1939) ; *Cohrs v. Igoe Brothers, Inc.,* 71 *N. J. Super.* 435, 448 (App. Div. 1962).

And, briefly, these are the rules which the courts of this State developed: As to interest upon judgments, the practice permitted collection at the "legal" rate, that is, at the rate permitted to be contracted under the usury statute to which we have referred. With respect to prejudgment interest, our courts of law assessed interest, if the demand was liquidated, at the same "legal" rate on the assumption that the creditor could have earned such interest if his obligor had paid him what was due, see *Jersey City v. O'Callaghan, supra,* 41 *N. J. L.* at 354, but declined to allow interest on claims that were unliquidated. The justice of that limitation has

been questioned, as we will develop in a moment. Our courts of equity allowed or withheld interest or fixed the rate as justice dictated. See *Small v. Schuncke,* 42 *N. J.* 407, 415–416 (1964); *Agnew Co. v. Paterson Board of Education,* 83 *N. J. Eq.* 49, 67–70 (Ch. 1914), affirmed o. b., 83 *N. J. Eq.* 336 (E. & A. 1914); *Jardine Estates, Inc. v. Donna Brooks Corp.,* 42 *N. J. Super.* 332, 340–341 (App. Div. 1956); *Dial Press, Inc. v. Phillips,* 23 *N. J. Super.* 543, 551–552 (App. Div. 1952), certif. denied, 12 *N. J.* 248 (1953); *McGlynn v. Schultz,* 90 *N. J. Super.* 505, 529–530 (Ch. Div. 1966), affirmed, 95 *N. J. Super.* 412 (App. Div. 1967), certif. denied, 50 *N. J.* 409 (1967); *Brown v. Home Development Co.,* 129 *N. J. Eq.* 172, 178 (Ch. 1941).

In this setting we adopted *R.* 4:42–11 which reads:

*"Interest: Rate on Judgments; in Tort Actions.*

(a) *Rate.* Judgments, awards and orders for the payment of money and taxed costs shall bear interest at 6% per annum from the date of entry, except as otherwise ordered by the court.

(b) *Tort Actions.* In tort actions, including products liability actions, the court shall include in the judgment interest at 6% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later. The contingent fee of an attorney shall not be computed on the interest so included in the judgment."

It will be noted that paragraph (a) deals with interest upon judgments. We dealt in that rule with post-judgment interest because the Legislature had amended the usury statute, *N. J. S. A.* 31:1–1, to permit the rate upon ordinary loans to go as high as 8% if the Commissioner of Banking and Insurance so provides. By adopting paragraph (a), we advised the bar and the clerks of the courts that judgments would continue to carry interest at the rate of 6%, in accordance with our prior practice. That paragraph has not drawn fire, although the constitutional challenges addressed to paragraph (b) would be no less appropriate if they have substance. We could have waited until some litigant raised the issue, but we thought it good sense and good administration

to inform all concerned through the vehicle of a rule incorporated in our rules of civil practice. As we have said, our doing so has not excited criticism. It is subparagraph (b), relating to prejudgment interest, which is attacked.

We repeat there is no conflict with any statute; there is no statute on the subject. Nor can it be doubted that the Court has the power and the continuing responsibility to change these judge-made rules of law as justice may require. In short, had the proposition in paragraph (b) been announced in a case of A against B, there could be no claim that the Court lacked the power or in any way transgressed upon the area contitutionally allotted to the Legislature. Thus it is not our power to act that is questioned; it is the method we chose to exercise that power.

But if we erred in adopting that method (we will demonstrate in Point II below that we did not), this litigation would not end. For plaintiffs here are entitled to ask for the same result which the challenged rule provides. They cannot be denied their due merely because we mistakenly expressed our view in a rule of court. The underlying issue is thus before us. The merits have been argued fully, and the litigants thus afforded a hearing. Nothing new, however, emerged. This is not surprising, for the subject is not new, and was fully explored at a public hearing before we adopted the rule.

We turn then to the merits. Interest is not punitive, *Wilentz v. Hendrickson,* 135 *N. J. Eq.* 244, 255–256 (E. & A. 1944); here it is compensatory, to indemnify the claimant for the loss of what the moneys due him would presumably have earned if payment had not been delayed. We mentioned earlier the judge-made limitation that interest should not be allowed if the claim was unliquidated. That limitation apparently rested upon the view that a defendant should not be deemed in default when the amount of his liability has not been adjudged. But interest is payable on a liquidated claim when liability itself is denied, even in good faith, *Kamens v. Fortugno,* 108 *N. J. Super.* 544, 552–553 (Ch.

Div. 1970). The fact remains that in both situations the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered. This is true whether the contested liability is for a liquidated or for an unliquidated sum. For that reason, the concept of a "liquidated" sum has often been strained to find a basis for an award of interest.

It is said there is now, in general, a willingness to allow interest on unliquidated claims as justice may dictate. 22 *Am. Jur. 2d, Damages,* § 181, pp. 259–260. In upholding the retrospective application of a New York statute providing for interest in contract actions upon unliquidated damages, the United States Supreme Court observed that "The statutory allowance is for the purpose of securing a more adequate compensation by adding an amount commonly viewed as a reasonable measure of the loss sustained through delay in payment," and that "It has been recognized that a distinction, in this respect, simply as between cases of liquidated and unliquidated damages, is not a sound one." *Funkhouser v. J. B. Preston Co.,* 290 *U. S.* 163, 168, 54 S. Ct. 134, 136, 78 *L. Ed.* 243, 246 (1933).

■ So also, a refusal to allow interest in tort matters has been criticized. See *Moore-McCormack Lines v. Amirault,* 202 *F.* 2d 893 (1 Cir. 1953). It is questioned whether justice is thereby done as between parties to the suit. But beyond their interest, there is also a public stake in the controversy, for tort litigation is a major demand upon the judicial system. Delay in the disposition of those cases has an impact upon other litigants who wait for their turn, and upon the taxpayers who support the system. And here there is a special inducement for delay, since generally the claims are covered by liability insurance, and when payment is delayed, the carrier receives income from a portion of the premiums on hand set aside as a reserve for pending claims. See *In re Insurance Rating Board,* 55 *N. J.* 19 (1969). Hence prejudgment interest will hopefully induce prompt defense consideration of settlement possibilities. In that

meaningful way, prejudgment interest bears directly upon the judicial machinery and the problems of judicial management. It is this facet, added to the consideration of justice between the litigants, which warrants our holding that prejudgment interest be payable in these matters.

The proposition we thus accept is not uniquely ours. There are a number of States which so provide by statute. See Colorado: *Rev Stats.* 1963, *Ann.*, § 41-2-1; Louisiana: *LSA-R. S.* 13:4203; Michigan: *Stat.* § 27A.6013, M. C. L. A. § 600.6013, New Hampshire: *RSA* § 524:1-b (Supp.); New York: *CLPR* § 5001(a) (damages to property); North Dakota: § 32-03-05; Oklahoma: 12 *Okla. St. Ann.* § 27(2); Rhode Island: *Gen. Laws,* § 9-21-10. We add, parenthetically, that it is of no moment that there the principle was established by the Legislature. As we have already noted, the subject of interest on claims rests wholly in case law in our State, and, assuming as we do for the moment that the issue is one of substantive law, the power and responsibility of the judiciary to deal with the subject in the absence of a statute cannot be questioned.

We see no strength in the assertion that the allowance of interest duplicates some element of damage or constitutes a payment with respect to damages not yet experienced. The jury is not instructed to add interest to its verdict in tort cases. In any event an instruction to the jury can obviate the risk. And with respect to the criticism that a verdict may embrace losses not yet suffered, the answer is that a verdict necessarily anticipates future experience, and the interest factor simply covers the value of the award for the period during which the defendants had the use of the moneys to which plaintiffs are found to be entitled. We think the equities are met when the date for the commencement of liability for interest is fixed as set forth in paragraph (b) of *R.* 4:42-11 (the rule here under attack).

 The question arises whether our holding that prejudgment interest be paid should be imposed retrospectively. We see no reason not to apply the usual rule that judge-

made law is retrospective. Under our holding plaintiffs merely receive what in justice is their due, and defendants are required to turn over a gain they received at the plaintiffs' expense. We note that where liability for prejudgment interest was established by statute, the statutes were held to be "remedial" and hence applicable to actions brought before the statute's effective date, and this notwithstanding the usual rule that statutes operate prospectively. *Pepin v. Beaulieu,* 102 *N. H.* 84, 151 *A.* 2d 230 (Sup. Ct. 1959); *Foster v. Quigley,* 94 *R. I.* 217, 179 *A.* 2d 494 (Sup. Ct. 1962); *Kastal v. Hickory House, Inc.,* 95 *R. I.* 366, 187 *A.* 2d 262 (Sup. Ct. 1963); *Ballog v. Knight Newspapers, Inc.,* 381 *Mich.* 527, 164 *N. W.* 2d 19 (Sup. Ct. 1969); see also *Wilcoxon v. Sun Oil Co.,* 49 *Misc.* 2d 589, 267 *N. Y. S.* 2d 956 (Sup. Ct. 1966).

■ Finally we add that we see no merit in the proposition advanced by the intervenor, that the usual insurance policy, which provides for payment of interest upon a judgment, does not cover prejudgment interest and therefore we should not impose such liability. It is enough to say the carrier's obligation to pay the judgment plainly includes the obligation to pay the constituent elements of damage incorporated in that judgment, among which, of course, is the item of prejudgment interest.

## II

For the reasons given in "I" above, the question whether this Court exceeded its power when it adopted *R.* 4:42–11 (b) is academic. The underlying merits have been reached and decided. Nonetheless we will state why we believe the adoption of the rule was consonant with proper judicial performance.

## A

■ ■ Defendants point out that the rule-making power granted the Supreme Court in *Art.* VI, § 2, ¶ 3, relates to

"practice and procedure," and from this grant defendants would infer that this constitutional provision inferentially dictates the mode whereby the Supreme Court may make "substantive" law. But the constitutional provision is what it purports to be — a grant of power with respect to "practice and procedure." It does not purport to deal with substantive law or to prescribe a format for the discharge of the Court's responsibility as to that topic. Limitations of course do exist, but they arise, not from the cited secton of the Constitution, but from the nature of the judicial process and of the Court's responsibility.

Nor, for that matter, is the constitutional grant of power with respect to "practice and procedure" a mandate that that subject may be dealt with only in a rule-making process. Many matters of practice and procedure repose in case law. Sometimes the procedures established in a judicial opinion will later be embodied in a formal rule of practice and procedure.[1] Commonly they are not.[2] Or a formal rule may expressly call for a case-by-case exposition, as for example, R. 4:4–4(i) relating to service of process which expressly leaves the outer reaches of substituted service to "due process of law." Indeed the most valued rights upon which life, liberty, and property depend are "procedural" and are embedded in the Constitutions of the United States and of this State. Although those rights are procedural, the courts have not chosen to particularize those rights by way of a rule-making process. Cases are legion which expound their

[1] For example, the procedure outlineed in *New Jersey Dept. of Health v. Roselle*, 34 *N. J.* 331 (1961), for the handling of contempt matters was thereafter incorporated in the formal rule, *R.* 1:10. In *State v. Abbott*, 36 *N. J.* 63, 77–78 (1961), we dealt with the problem of offers of proof in criminal matters and thereafter incorporated the suggested practice in *R.* 1:7–3.

[2] For example, in *State v. Guido*, 40 *N. J.* 191, 199–200 (1963), we suggested a procedure to deal with the problem of the recalcitrant witness.

meaning and the consequences of infringement. And, finally, a matter of practice may be prescribed in an administrative directive.[3]

The constitutional grant of rule-making power as to practice and procedure is simply a grant of power; it would be a mistake to find in that grant restrictions upon judicial techniques for the exercise of that power, and a still larger mistake to suppose that the grant of that power impliedly deprives the judiciary of flexibility in the area called "substantive" law.

## B

"Substantive" law of course is regularly established in cases brought before the Court. But there is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may express doubts upon existing doctrines, thereby inviting litigation, or may itself raise an issue

---

[3] In *State v. Pontery*, 19 *N. J.* 457, 468 (1955), it was said by way of dictum that the prosecutor could not effectively waive the death penalty and thus take that issue out of the case. That proposition affected procedure, and quite obviously "substance" too in terms of the impact upon the individual. We prepared an administrative memorandum, *In re Waiver of Death Penalty*, 45 *N. J.* 501 (1965), which we directed to be published both in the *New Jersey Law Journal* and in the official *New Jersey Reports* for "the information of the bench, the bar and the public," in which we said (*p.* 502) :

> Since it is not likely that the Supreme Court will have occasion in a litigated case to express itself on the subject, the Supreme Court, after careful consideration of the matter, has concluded that in the public interest and in the interest of the fair and expeditious administration of criminal justice it should advise all judges by means of this administrative memorandum that it does not subscribe to the *dictum* in the *Pontery* case.

We thought that step was sensible and within the obligation and authority of the judiciary.

it thinks should be resolved in the public interest, or may deliberately decide issues which need not be decided when it believes that course is warranted. So a court may decide an issue even though the litigation has become moot, again in the public interest. *John F. Kennedy Memorial Hospital v. Heston,* 58 *N. J.* 576, 579 (1971); *Board of Education, East Brunswick Tp. v. East Brunswick,* 48 *N. J.* 94, 109 (1966); *Delaware River and Bay Auth. v. International Org., etc.,* 45 *N. J.* 138, 142 (1965); *Cooke v. Tramburg,* 43 *N. J.* 514, 516 n. 1 (1964); *State v. Perricone,* 37 *N. J.* 463, 469 (1962), *cert.* denied, 371 *U. S.* 890, 83 *S. Ct.* 189, 9 *L. Ed.* 2d 124 (1962).

 Defendants refer to the statement in *Winberry v. Salisbury,* 5 *N. J.* 240, 248 (1950), *cert.* denied, 340 *U. S.* 877, 71 S. Ct. 123, 95 *L. Ed.* 638 (1950), that "While the courts necessarily make new substantive law through the decision of specific cases coming before them, they are not to make substantive law *wholesale* through the exercise of the rule-making power" (emphasis ours). There can be no quarrel with that proposition, but one might note in passing that *Winberry* is a classic example of a deliberate decision upon a far-reaching issue, involving the respective powers of the Supreme Court and the Legislature, which no doubt could have been avoided but which the majority believed should be decided then in the public interest.

## C

And finally, it is simplistic to assume that all law is divided neatly between "substance" and "procedure." A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account. Speaking of the proposition that a court may not promulgate rules governing substantive law in the exercise of their rule-making power, Professors Levin and Amsterdam agreed that "rational separation is well-nigh impossible." "Legislative Control over Judicial Rule-making: A Problem in Constitu-

tional Revision," 107 *U. Pa. L. Rev.* 1, 14–15 (1958). See also *State v. Otis Elevator Co.*, 12 *N. J.* 1, 24 (1953) (Jacobs, J. dissenting). As said in *Hanna v. Plumer,* 380 *U. S.* 460, 471, 85 S. Ct. 1136, 1144, 14 *L. Ed.* 2d 8, 16–17 (1965), "The line between 'substance' and 'procedure' shifts as the legal context changes. 'Each implies different variables depending upon the particular problem for which it is used.' " One context is conflict of laws; another is retrospective application of statutes; and a third is law-making, the subject at hand.

As to conflict of laws, the traditional approach was to decide whether the issue was "substantive" or "procedural," the law of the forum to be applied if the matter was "procedural." The *Restatement* (2d) *of Conflict of Laws* (1971), comment b to § 122, *p.* 352, correctly discards that approach and goes directly to the question whether the law of the forum should be applied with respect to each particular subject.[4] As to a conflicts issue, the forum would prefer to apply rules with which it is familiar, thus to avoid the inherent margin of error when the forum tries to decide what

---

[4]The comment reads:

*Substance — procedure dichotomy.* The courts have traditionally approached issues falling within the scope of the rule of this Section by determining whether the particular issue was 'procedural' and *therefore* to be decided in accordance with the forum's local law rule, or 'substantive' and *therefore* to be decided by reference to the otherwise applicable law. These characterizations, while harmless in themselves, have led some courts into unthinking adherence to precedents that have classified a given issue as 'procedural' or 'substantive', regardless of what purposes were involved in the earlier classifications. Thus, for example, a decision classifying burden of proof as 'procedural' for local law purposes, such as in determining the constitutionality of a statute that retroactively shifted the burden, might mistakenly be held controlling on the question whether burden of proof is 'procedural' for choice-of-law purposes. To avoid encouraging errors of that sort, the rules stated in this Chapter do not attempt to classify issues as 'procedural' or 'substantive'. Instead they face directly the question whether the forum's rule should be applied.

another jurisdiction would likely do. On the other hand, if the ultimate result is permitted to turn upon the forum selected, there are the evils and injustices of forum-shopping.

When the context is retrospective application of a statute, the values involved are different, for then the target is whether some right or liability is so "vested" as to make it unjust to change the rules. *Morin v. Becker*, 6 *N. J.* 457, 464–471 (1951); *Pennsylvania Greyhound Lines, Inc. v. Rosenthal*, 14 *N. J.* 372, 380–388 (1954). In *Rosenthal*, in which the Joint Tortfeasors Contribution Law was applied to a payment made after the statute was enacted but upon a judgment which antedated that law, it was aptly said (*p.* 382):

> \* \* \* It was pointed out by Lehman, C. J., that "changes of form are often closely bound up with changes of the substance," and "nice distinctions are often necessary," but in the end "it is in considerations of good sense and justice that the solution must be found."

And, finally, in the context of rule-making, other factors may come into play. The Court may be spurred by the needs of the judicial system measured, not only by the private interests of all litigants, but also by the interest of the public. Or the Court, mindful of the problem of exclusivity and its impact upon the delicate relations among the co-equal branches of government, may be reluctant to move or to go as far as it would if the Legislature retained the power to disagree.

To illustrate, what is the statute of limitations? For conflict of laws purposes, it is usually said to be "procedural," meaning that the law of the forum will be applied, *Marshall v. Geo. M. Brewster & Sons, Inc.*, 37 *N. J.* 176, 179–182 (1962); see *Restatement* (2d) *of Conflict of Laws* (1971) § 142, although even there the just course may be to apply the law of another State if the parties were there throughout its period of limitations and the suit was brought after that

period had run.[5] In the context of retrospective application of a statute, there may be no substantial reason to refuse to apply a change in a period of limitations retrospectively so long as a barred cause of action is not thereby revived or an existing cause of action is not thereby barred without a fair opportunity to sue. But when we turn to the third context, whether the statute of limitations is within the Court's rule-making power, the considerations may well be different. We need but say that thus far it has not been suggested that this subject matter is "procedural" within the meaning of our constitutional provision. On the other hand, time for appeal, which much resembles a statute of limitation, may confidently be said to come within the Court's rule-making power. *R.* 2:4.

What is "evidence"? It arguably is "procedural," "substantive" or a hybrid. It smacks of "procedure" insofar as it controls what may enter the mix, but it is quite "substantive" as an ingredient of the end product, the judgment. Some rules of evidence, particularly those relating to privileges, may themselves be thought to generate rights or values of a "substantive" cast. In the context of conflict of laws, evidence generally would be for the forum. *Restatement* (2d) *of Conflict of Laws* (1971) § 138 adopts that view, with, however, certain exceptions. In the context of retrospective application of a statute, it would likely again be "procedural" in most respects. But the third context, the respective powers of the legislative and judicial branches, brings other values into view.

We participated in a process whereby a code of evidence was adopted "wholesale," to use a word in the quotation above from *Winberry.* The rules of evidence were adopted cooperatively by the three branches of government under the

---

[5] "Borrowing" statutes, adopted in some States, establish the exception just suggested to the rule of the forum. We have just reached the same conclusion as a matter of decisional law in *Heavner v. Uniroyal, Inc.*, 63 *N. J.* 130 (1973).

Evidence Act, 1960 (*L.* 1960, *c.* 52; *N. J. S. A.* 2A:84A–1, *et seq.*) after the Supreme Court and the Legislature conducted their separate studies. Under the statutory arrangement, some of the rules, notably those embodying privileges, were fixed in the statute itself while other rules, prepared by the Court after consideration at a Judicial Conference, were filed with the Legislature to become effective unless disapproved by a joint resolution signed by the Governor. Thus we did not pursue to a deadlock the question whether "evidence" was "procedural" and therefore, according to the *Winberry* dictum, the sole province of the Supreme Court. Nor were we deterred by the spectre of the criticism that, if "evidence" is "substantive," it was unseemly or worse for the Court to participate in the "wholesale" promulgation of substantive law. The single question was whether it made sense thus to provide for the administration of justice, and the answer being clear, we went ahead.[6] We add that the United States Supreme Court, which does not have a constitutional grant of rule-making power as to practice and procedure, is pursuing a similar project in cooperation with the Congress. 18 *U. S. C. A.* §§ 3402, 3771, 3772 (1964); 28 *U. S. C. A.* §§ 2072, 2075 (1958).

### D

What then is "interest"? As we have said, it is compensatory as to the parties and represents "damages" for delay in payment. "Damages" constitute a "remedy." And "remedy" promptly connotes "procedure." 1 *Am. Jur.* 2d, *Actions,* § 6, *p.* 546. But in the context of conflict of laws, the majority view is that "damages" go to the substance, *i. e.,* that it would disserve the values involved to apply the

---

[6]The agenda at the Judicial Conference held on May 24–25, 1973 included the subjects of polygraph and voiceprint. We thought it appropriate to gather whatever information we could, without deciding the format of such action, if any, which we may take.

law of the forum rather than the law of the place of the wrong.[7] 22 *Am. Jur.* 2d, *Damages,* § 3, *pp.* 15–16. The *Restatement* (2d) *of Conflict of Laws* (1971), §§ 145 and 171, espouses that view. Prejudgment interest may be deemed to be part of the damages occasioned by the initial wrong, although one might say that such interest is a remedy for a second wrong, *i. e.,* the delay in payment. Upon the latter view the situs of that wrong might arguably be the forum. The *Restatement* (2d) *of Conflict of Laws* (1971), § 171, comment c, would apply to prejudgment interest the same rule applicable with respect to the basic damages to determine "whether the plaintiff can recover interest and, if so, at what rate for a period prior to the rendition of judgment as part of the damages for a tort."

Upon that approach, the statutes providing for prejudgment interest would not be applied to a foreign cause of action. This is the view usually taken. See *Sylvania Electric Products v. Barker,* 228 *F.* 2d 842, 850–851 (1 Cir. 1956), cert. denied, 350 *U. S.* 988, 76 S. Ct. 475, 100 *L. Ed.* 854 (1956) ; *Moore-McCormack Lines v. Amirault, supra,* 202 *F.* 2d at 896–897; *Ryan v. Ford Motor Co.,* 334 *F. Supp.* 674 (E. D. Mich. 1971) ; *New Amsterdam Casualty Co. v. Soileau,* 167 *F.* 2d 767 (5 Cir. 1948), cert. denied, 335 *U. S.* 822, 69 S. Ct. 45, 93 *L. Ed.* 376 (1948) ; *Williams v. Petroleum Helicopters, Inc.,* 234 *So.* 2d 522 (La. Ct. App. 1970), cert. denied, 256 *La.* 371, 236 *So.* 2d 501 (Sup. Ct. 1970) ; but see *Glick v. White Motor Co.,* 458 *F.* 2d 1287, 1293 n. 13A (3 Cir. 1972). But when the context is the retrospective application of such a statute, the statute is generally deemed to be "remedial" and "procedural" and hence to apply to a preexisting cause of action not yet reduced to

---

[7]But the answer may be otherwise when the foreign event concerns only citizens of the forum or citizens of States other than the State of injury. See *Pfau v. Trent Aluminum Co.,* 55 *N. J.* 511, 523-524 (1970).

judgment.[8] We have already referred to decisions so holding and repeat the citations for the convenience of the reader.[9] *Pepin v. Beaulieu,* 102 *N. H.* 84, 151 *A.* 2d 230 (Sup. Ct. 1959); *Foster v. Quigley,* 94 *R. I.* 217, 179 A. 2d 494 (Sup. Ct. 1962); *Kastal v. Hickory House, Inc.,* 95 *R. I.* 366, 187 *A.* 2d 262 (Sup. Ct. 1963); *Ballog v. Knight Newspapers, Inc.,* 381 *Mich.* 527, 164 *N. W.* 2d 19 (Sup. Ct. 1969); see also *Wilcoxon v. Sun Oil Co.,* 49 *Misc.* 2d 589, 267 *N. Y. S.* 2d 956 (Sup. Ct. 1966). We refer again to *Funkhouser v. J. B. Preston Co., supra,* 290 *U. S.* 163, 54 S. Ct. 134, 78 *L. Ed.* 243, in which it was held that a statute imposing interest upon unliquidated damages in contract matters could constitutionally be applied to a preexisting transaction. The Court said (290 *U. S.* at 167, 54 S. Ct. at 135, 78 *L. Ed.* at 245–246):

\* \* \* \* The contractual obligation of appellants was to take and pay for the described articles, and the law, in force when the contract was made, required that in case of breach appellants should make good the loss sustained by the appellee. The ascertainment of that loss, and of what would constitute full compensation, was a *matter of procedure* within the range of due process in the enforcement of the contract. (Emphasis added.)

With respect to our immediate context — the making of rules of law — it may be noted that the New York statute

---

[8] Our prejudgment interest rule is thus retrospective. See "Notice to the Bar," 95 *N. J. L. J.* 349 (April 13, 1972); *American Metal Co. v. Fluid Chemical Co.,* 121 *N. J. Super.* 177, 183 (Law Div. 1972).

[9] A somewhat parallel case is *Jersey City v. O'Callaghan, supra,* 41 *N. J. L.* 349. The suit was for the refund of an illegal assessment. At the time of the wrong the usury statute provided for 7% interest but the rate was later lowered to 6%. The Court of Errors and Appeals accepted the proposition that a reduction in the usury rate would not affect an express agreement to pay the higher rate, but held that, since in the absence of such an agreement interest was a matter of damages, the measure should reflect the statutory change. Hence interest was allowed at 7% to the effective date of the statutory amendment and at 6% thereafter.

involved in *Funkhouser,* the case just cited, was a section of the *Civil Practice Act of New York,* thus evidencing a legislative evaluation that the subject was "procedural." So also, in five of the eight States which provide by statute for prejudgment interest in tort matters (p. 360 of this opinion), the statutes are included among laws dealing with procedure. One State (North Dakota) places the statute under "Judicial Remedies," while another (Colorado) includes it under "Damages" in the substantive law portion of the laws.

In the light of the foregoing it surely cannot be said to have been palpably inappropriate to think of prejudgment interest as a matter of procedure in the context of law-making. The question was of general concern, affecting many thousands of pending tort actions. The issue could have been raised in any of those cases, at the instance of the litigant or on the court's own motion. Had the issue been raised that way, all litigants would have been bound by the result notwithstanding that they were not heard upon the merits. One of the consequences of the stubborn myth that courts do not make law is the continuing failure to develop a technique whereby all may be heard who are interested in a legal proposition and might contribute to an informed decision. In this respect the rule-making approach is clearly superior. Here all interests were heard at a public meeting. Surely the litigants themselves lost nothing in that process. And when there is added the signal fact that the rule, while serving the cause of justice as between litigants, has the equally important objective of expediting the disposition of cases, thereby to advance the welfare of all litigants and the welfare of the taxpayers who must support the system, we have no doubt of the propriety of the course we followed. The rule concerns the practice and procedure in the courts in any view of that subject notwithstanding that the rule has also a "substantive" impact upon the dollar result. It made sense to invoke the rule-making process in such circumstances. It was a responsible exercise of our responsibility.

In *Crudup v. Marrero,* 57 *N. J.* 353 (1971), there was involved still another rule which, although having a dollar impact upon the litigants, was nonetheless beamed toward the effective management of the judicial system. The rule, *R.* 4:58–1, *et seq.,* deals with offers of judgment and provides for interest and counsel fees on the basis of the relationship between the verdict and a pretrial offer of settlement. The issue in the case was whether the rule applied to the Unsatisfied Claim and Judgment Fund. In holding that it did, we said (*p.* 361):

At any rate, the factors described above stimulated adoption of the Offer of Judgment rules with which we are now concerned. It is a remedial measure in operation on a test basis and designed to produce early out-of-court settlements. As already pointed out, the broad language does not exclude any negligence or unliquidated damage case from their operation. The Unsatisfied Claim and Judgment Fund has a very substantial number of such cases in the trial lists throughout the State. Every time it tries a case that could and fairly should be settled without trial, disposition of other pending actions, some of which must be tried, is delayed. Accordingly, in our judgment, in the ordinary situation the Fund must be regarded as · subject to the Offer of Judgment rules. "Interest" to the extent that it may be imposed under those rules is within the Fund's statutory authorization to pay interest. But even if the statute contained no such authority, the grant of interest under the rules is well within the inherent powers of this Court. The same is true with respect to the grant of counsel fees up to $750. As a procedural sanction they are likewise within our broad constitutional power, and as such they are within the statutory provision for costs. *Compare Red Devil Tools v. Tip Top Brush Co., Inc.,* 50 *N. J.* 563, 576 (1967); *Vargas v. A. H. Bull Steamship Co.,* 25 *N. J.* 293, 296 (1957), *cert. den.* 255 *U. S.* 958, 78 *S. Ct.* 545, 2 *L. Ed.* 2d 534 (1958).

This quotation refers to "costs" and "counsel fees." Quite obviously both have a dollar impact upon litigants. Yet "costs" are characterized as "essentially procedural," *John S. Westervelt's Sons v. Regency, Inc.,* 3 *N. J.* 472, 479 (1950), even though statutes still deal with the subject (see *N. J. S. A.* 22A:2–2, 3, 9, 10 and 11). And as to "counsel fees," which no less than "interest" or "costs," have a "substantive" dollar impact, the subject has been consistently

held to be one of practice and procedure within the constitutional grant of power to the Supreme Court and is governed by *R.* 4:42–9. *John S. Westervelt's Sons v. Regency, Inc., supra,* 3 *N. J.* at 479; *Liberty Title & Trust Co. v. Plews,* 6 *N. J.* 28, 44 (1950); *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433, 495 (1952), *cert.* denied, 344 *U. S.* 838, 73 *S.* Ct. 25, 97 *L. Ed.* 652 (1952); *State v. Otis Elevator Co.,* 12 *N. J.* 1, 5 (1953); see *Alcoa Edgewater No. 1 Fed. Credit Union v. Carroll,* 44 *N. J.* 442 (1965), and *Red Devil Tools v. Tip Top Brush Co., Inc.,* 50 *N. J.* 563, 576 (1967).

It is insisted we cannot uphold the rule for prejudgment interest without also deciding whether the rule comes within the *Winberry* dictum that the Court's authority as to practice and procedure is exclusive. We see no need to meet that issue. The sole question is whether the Court may treat the subject by a rule rather than by a judicial decision despite the substantive aspect of the subject. The issue of exclusivity involves a touchy matter, the relations among the three branches of government. It will be time enough to talk about exclusivity when there is an impasse and no way around it.[10] A coordinate branch should not invite a test of strength by proclamation. Our form of government works best when all branches avoid staking out the boundaries which separate their powers.

## III

██ ██ The final question is whether the rule denies equal protection because it is limited to tort actions.

---

[10]In some instances our rules expressly accept statutory provisions relating to the same subject matters. See *R.* 4:27–2; *R.* 4:42–8(a); *R.* 4:52–7; *R.* 4:59–1; *R.* 4:83–1. After the adoption of the prejudgment interest rule here involved, the Legislature enacted the New Jersey Tort Claims Act, *N. J. S. A.* 59:1–1, *et seq.,* which provides in *N. J. S. A.* 59:9–2a that "No interest shall accrue prior to the entry of judgment against a public entity or public employee." We have approved an amendment to our rule of Court which will except that situation.

We see no serious issue. To begin with, tort actions are a distinctive class of litigation having a special impact upon the administration of the judicial system in terms of volume. They are distinctive too insofar as overall there is insurance coverage permitting carriers to invest for gain portions of the premiums allocated to the reserve for pending claims. Further, problems of this kind may be met in stages or on the basis of intensity. Hence it is no solid objection that a rule, whether announced in a judicial opinion or in a rule of court, does not go as far as it might. See *New Jersey Chapter, American Institute of Planners v. New Jersey State Board of Professional Planners*, 48 *N. J.* 581, 601–603 (1967), appeal dismissed, 389 *U. S.* 8, 88 S. Ct. 70, 19 *L. Ed.* 2d 8 (1967). Finally the adoption of the rule does not foreclose holders of other unliquidated claims from contending the circumstances which attend their scene are so like the circumstances here involved that interest should also be allowed to them.

The judgments are affirmed. Mr. Justice Jacobs and Mr. Justice Proctor join in this opinion.

HALL, J. (concurring in result). The matter of interest on claims before judgment and on judgments is one of those gray areas, like rules of evidence, which has both procedural and substantive aspects. Whether such areas should be called procedural or substantive for purposes of the exercise of this court's rule-making power may well turn more on history and tradition, as between the legislative and judicial branches in the particular field, than on pedantic legal analysis. The Legislature of this state has never acted generally in the area of pre-judgment and post-judgment interest and the matter has historically been left to the judiciary. My view is that, especially in the light of this history, the subject matter of *R.* 4:42–11 has sufficient procedural aspects justifying the court's adoption of it in the first instance.

It seems to me, however, that it would be more appropriate in the future for rules proposed by the court in these over-

lapping areas to be worked out in advance cooperatively between the three branches of government, as was done so successfully in the case of the evidence rules. The court would still retain exclusive power in those fields in which there can be no reasonable contention that substantive law is predominantly involved, as ·well as, of course, in the areas of administration of the courts and admission to and regulation of the bar. The Legislature, by *L.* 1970, *c.* 258, *N. J. S. A.* 2A:84A–39.1 to –39.6, has provided an adaptable mechanism for this process by creating a permanent legislative commission called the State Rules of Court Review Commission[1] "to study and review * * * any rule of court in effect, or proposed, which the commission considers may call for legislative action to aid in the achievement of the intended purpose, or the solution of a problem, by means of amendatory, supplemental, revisory or new legislation." *N. J. S. A.* 2A: 84A–39.3. Indeed, in the light of the substantive aspects of *R.* 4:42–11, the Commission might well review and consider it with the court, with the view to making a recommendation to the Legislature thereon. In this particular situation I would defer to ultimate legislative action. In the meantime, the rule should stand.

The other opinions filed herein consider also the power of this court to make substantive law by rule. In the view I have expressed, I do not reach this question beyond saying that, regardless of any right of the court to change the common law by various mechanisms, I presently believe it at least inappropriate and unwise to do so by general rule outside of the framework of a particular case before us. For example, the Legislature has recently adopted comparative negligence, *L.* 1973, *c.* 146. (This statute contains procedural as well as substantive features, but it is predominantly sub-

---

[1]My understanding is that this Commission is not presently operative by reason of the failure to appoint half of its members, which can and should be promptly rectified.

stantive.) I am convinced it would not have been fitting for the court to have enacted the principle by rule, although it might properly have done so in deciding an appeal.

I would affirm the judgments under review on the basis expresed above.

Justice Sullivan joins in this opinion.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting. I would modify the judgments in these cases to strike the items of prejudgment interest for the following reasons:

1. *R.* 4:42–11(b), providing for prejudgment interest in tort cases, is predominantly of a substantive nature, not within the category of practice and procedure governable by rules to be promulgated by this Court under Article VI, Section II, paragraph 3 of the 1947 Constitution.

2. This appeal is not an appropriate vehicle for the Court to employ to adopt the substance of the cited rule in the purported exercise of the court's power to change the common law by the adjudicative process.

3. If it were appropriate for the court to consider adoption of a rule of the general nature of *R.* 4:42–11(b) in the course of this appeal, I would oppose its adoption, primarily because the rule is mandatory, and I believe any such rule should be permissive and discretionary with the trial court.[1]

## I.

This Court's rule-making power is declared by the Constitution as follows:

---

[1]Since the argument of the appeal the court has amended *R.* 4:42–11(b), effective September 10, 1973, to render it consistent with the New Jersey Tort Claims Act, *L.* 1972, *c.* 45, which became effective July 1, 1972. That act provides that "No interest shall accrue prior to the entry of judgment against a public entity or public employee." *N. J. S. A.* 59:9–2a. The merits of the rule as thus amended have not been argued on the appeal, and I take no position on it, not having been assigned to the Court when the amendment was adopted.

. The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. * * *. (Art. VI, § II, par. 3)

On the face of that language the grant of general rule-making power to the court extends only to practice and procedure. If, therefore, a rule ordaining that the recovery of a tort judgment shall be attended by allowance of interest on the award of damages antecedent to the date of the judgment is not within the common acceptance of the term "practice and procedure", the Court was without authority to promulgate it.

The general antonym of practice and procedure is substantive law. In *Winberry v. Salisbury,* 5 *N. J.* 240, 247–248 (1950), this court defined the latter term in the present context as that law "which defines our rights and duties", as distinguished from "pleading and practice, through which such rights and duties are enforced in the courts". By considered *dictum,* the court declared that the phrase, "subject to law," in the constitutional text did not mean that the Legislature could override rules of practice and procedure adopted by the court but rather that it meant that the rule-making power "must not invade the field of the substantive law as such". (*Id.* at 248). It was observed that, "[w]hile the courts necessarily make new substantive law through the decision of specific cases coming before them, they are not to make substantive law wholesale through the exercise of the rule-making power." *Ibid.*[2]

[2]Many objective students of the subject have thought that the majority in *Winberry* misread the actual intent of the 1947 Constitutional Convention and its Committee on the Judiciary in declaring the rule-making power of the court not subject to overriding or original action by the Legislature in relation to practice and procedure. See Kaplan & Greene, "The Legislature's Relation to Judicial Rule-Making: An Appraisal of *Winberry v. Salisbury*", 65 *Harv. L. Rev.* 234 (1951); and the concurring opinion of Justice Case (5 *N. J.* at 255). But see Pound, "Procedure under Rules of Court in New Jersey", 66 *Harv. L. Rev.* 28 (1952). However, the *dictum* in *Winberry* was transmuted into virtual holding in *George*

These observations are not of mere historical interest in the present framework. As the opinion of the plurality shows, the boundaries between practice and procedure and substantive law are often hazy and the categories are not always easily compartmentalized. But the Constitution contemplates that such boundaries shall be recognized and given heed every time the court promulgates a rule purporting to regulate practice and procedure. They surely must be staked out if a rule is subjected to constitutional challenge, as here. While I am of the view that the instant subject matter — prejudgment interest on a tort award — is in the area of damages and therefore on principle clearly assimilable to the field of substantive right rather than procedure, the plurality, while holding to the contrary, at least confesses its doubts on the subject: "* * * it surely cannot be said to have been *palpably* inappropriate to think of prejudgment interest as a matter of procedure in the context of law-making." (Emphasis added.) If there is any doubt, the court in my view should take into consideration in resolving it the constitutional consequences in terms of *Winberry*. Those consequences are that in making a considered determination, on express challenge of the point, as here, that an already adopted rule is in the procedural field, the court is also automatically perforce of *Winberry* staking out the subject matter as exclusively its own and off-limits to the other branches of government. In that light, it would seem to me unthinkable that the rule should be considered procedural, as I can-

*Siegler Co. v. Norton*, 8 *N. J.* 374, 381–382 (1952), and the Court has never since retreated from the position of exclusivity in the Court over practice and procedure. See also *State v. Otis Elevator Co.*, 12 *N. J.* 1, 12 (1953) ; *Sattelberger v. Telep*, 14 *N. J.* 353, 369–370 (1954) ; *State v. Haines*, 18 *N. J.* 550, 556–557 (1955). I therefore think that view must be posited as correct for purposes of this case. Were the court's jurisdiction over practice and procedure not exclusive, the inter-branch tension I foresee as possibly incident to the instant decision, see *infra*, would be lessened. If the Legislature knew it always had the last word as to a court rule, whether procedural or substantive, it would be less likely to be concerned over what might seem to it overreaching by the court in a given area.

not conceive any justification under our democratic system for a view that the legislative branch of the government would ever be powerless to ordain whether or to what extent prejudgment interest should be added to a tort (or, for that matter, contract) award. That recent legislatures have not regarded the subject as beyond their purview is clearly evidenced by *N. J. S. A.* 59:9–2, subd. a. See note 1, *supra.*

The plurality opinion purports not to be making such a determination of exclusivity of jurisdiction in the Court, describing the issue as a "touchy matter." But the determination of court exclusivity as to practice rules has already been made for this State in *Winberry and George Siegler Co. v. Norton, supra;* there has been no evidence to indicate that the Court contemplates an overturning of *Winberry* in the foreseeable future, indeed to the contrary; and the general public and the other branches of government are entitled to view Part II of this decision and *Winberry,* taken together, as constituting a doctrine that legislating prejudgment interest is the exclusive preserve of the Court. That prospect, it seems to me, is rife with the portent of general misgivings, better avoided as against the alternative of later adjudicative adoption of the principle, if still deemed desirable, rather than by rule-making, so that the Legislature can assuredly have the last word on it.[3]

In the light of the foregoing, the fact noted in the plurality opinion that a few cases have held prejudgment interest "remedial" in the sense that, where a rule therefor has been legally adopted, it has not been thought unfair to apply it

---

[3] The point made in the text is not rendered less relevant by the circumstance that the Legislature has acted on one aspect of the subject of prejudgment interest in Section *N. J. S. A.* 59:9–2(a) of the New Jersey Tort Claims Act (see note 1 *supra*) or that the court has amended *R.* 4:42–11(b) to accord therewith. Court deference to legislation in selected instances does not derogate from *Winberry* exclusivity; inter-branch tension may persist; and the advisability of judicial abstention from rule-making in so substantive an area is not lessened.

to actions begun before adoption, should bear little weight in deciding whether such an interest rule is procedural rather than substantive for purposes of a principle of state constitutional dimension requiring it to be categorized as one or the other. More consonant with the policy considerations mentioned above inherent in the Judicial Article and its interpretation in *Winberry* concerning such a choice is the line of authority cited in the plurality opinion for the principle that damages (including interest) is substantive in relation to rules of choice of law. So, too, is the precept that interest is substantive for purposes of application of state rather than federal law in diversity cases. See 36 *C. J. S.* "Federal Courts" § 189(8), p. 496 (1960); *New Amsterdam Casualty Co. v. Soileau,* 167 *F.* 2d 767, 771–772 (5 Cir. 1948), *cert.* den. 335 *U. S.* 822, 69 S. Ct. 45, 93 *L. Ed.* 376 (1948). The measure as well as the right of recovery would clearly appear to the litigants to pertain to the substance of their rights or privileges. Even prior to the recent example of legislative initiative on prejudgment interest contained in the New Jersey Tort Claims Act (see note 1 *supra*), our own decisions had strongly suggested the traditional control by the legislature over interest. See *Consolidated Police, &c., Pension Fund Commn. v. Passaic,* 23 *N. J.* 645, 651–652, 653 (1957). Thus court and legislature have conjointly regarded the subject as basically substantive.

It is of course evident that even aside from *Winberry* the court does not under the Constitution have power to promulgate rules other than for practice, procedure and administration of the courts. But the subsistence of *Winberry* argues for judicial moderation in selecting subject matter for rule-making, with an eye toward avoiding areas heavily laden with such substantive aspects, deeply interlaced with pervasive public policy, as are presented by the subject here of concern.

For all the reasons stated I would strike *R.* 4:42–11(b) as beyond the constitutional rule-making power of the Court.

## II

I pass to consideration of Part I of the plurality opinion, which, as I understand it, concludes that assuming *arguendo* that the rule in question is substantive and therefore should not have been promulgated as a rule of court, the court should nevertheless appraise its merit in the court's judicial capacity, which extends to alteration of substantive law. I do not know the extent, if any, to which the resolution of the plurality to take that course may be influenced by its alternative decision, expressed in Part II of the opinion, that the rule is sufficiently procedural to have justified its promulgation as a rule of court. For my part, having concluded the rule should be stricken, I would abstain *in this case* from consideration of its merits as a modification of the common law to avoid even a remote inference by the parties or the public that the result is basically a ratification of the improperly adopted rule. I would await such fresh case, if any, in which the desirability of the general principle might be advanced as an incident to the prosecution of the litigation, as contrasted with these cases, where the issue basically presented to the trial courts was the validity *vel non* of the promulgation of the specific rule.

This may seem like marching the soldiers up the hill and marching them down again without doing battle, but the philosophical implications of the matter go further. If the course here taken is acceptable, then the fundamental principle that courts cannot make substantive law "wholesale" by rule-making (*Winberry, supra,* 5 *N. J.* at 248) is susceptible of erosion since, in the case of any like future challenge to a court rule as substantive, the court might employ the instant decision as a precedent and, as here, adopt the substance of the rule "judicially", thereby effectively albeit unintentionally circumventing the constitutional proscription.

The distinction between law-making by a court as a *quasi*-legislature (rule-making) and law-making by a court in the

course of adjudication of causes between parties is fundamental to Anglo-American political science and to our Judicial Article. It should not be lightly elided. Our Constitution implicitly accepts the course of change in the common law through the judicial process. Such change is not, however, an avowed objective of that process but rather the incidental residue of the decisions of concrete controversies between litigants, as cogently developed in the dissenting opinion of Justice Mountain. The prime business of the court on an appeal, in my view, is to decide the case rather than to formulate or change the law. The court's consideration whether doing justice in the particular and like cases requires a change in the old or the formulation of new substantive doctrine, see *State v. Culver,* 23 *N. J.* 495, 505 (1957), is ordinarily subjected to the crucible of opposing argument by a specific litigant whose purse is affected by the proposed change. This factor, in addition to the judicial sense that long-range public acceptance of judge-made changes in the law is largely dependent on the gradualness of such changes, cf. *Falcone v. Middlesex Co. Medical Soc.,* 34 *N. J.* 582, 596 (1961) (per Jacobs, J.), is, I believe, integral to the survival of law-making through the adjudicative process in our political system.

Judicial law-making by promulgation of rules of court, on the other hand, is purposeful and avowed policy-making in gross, not essentially distinguishable in nature from the functioning of the elected legislative body. It is highly useful and appropriate in relation to practice and procedure in the courts. It is unacceptable and repugnant to our institutions in the substantive area. The relative efficiency or inefficiency of law-making by rule promulgation as compared with adjudication, discussed in the plurality opinion, is, I think, quite irrelevant to the underlying constitutional and political questions implicated.

These considerations would impel me to build a prophylactic wall between the necessary adjudication herein that *R.* 4:42–11(b) is invalid rule-making and the unnecessary em-

barkation in this particular appeal on the inquiry whether we should "judicially" adopt the substance of the rule. I would refrain from the latter.

## III

Were it necessary to decide whether the substance of the rule should be embraced judicially by the Court as a matter of substantive law, I would conclude in the negative, at least as to the rule as drawn.[4] The primary objection to it is its mandatory nature. There would be no serious objection to the principle of prejudgment interest if its application were subject to the discretion of the trial court in the particular case, as continues to be the rule on interest in equity and in relation to unliquidated damages in contract cases. See *Small v. Schuncke*, 42 *N. J.* 407, 415–416 (1964); *Consolidated Police, &c., Pension Fund Commn. v. Passaic*, *supra*, 23 *N. J.* at 655. The justice of making the defendant pay the claimant for the use of the money declared due during the pendency of the action is as pertinent to the contract or equitable obligor as to the tort obligor. Yet the sanction of interest remains discretionary in the former instances. And for good reason! Experience teaches that in many situations the winner of a money award is nevertheless denied costs by the court because of equities the other way. Why disarm the trial judge of discretion to deny, or to allow only partial prejudgment interest in tort cases when a comparable balance of equities points in that direction?

As one of numerous illustrations which might be afforded, there might be intervening appeals between institution of action and final judgment, inordinately protracting the interest-payment period under the rule, yet where the occasion for the appeal was not attributable to acts of the defendant but to those of the trial court of the plaintiff. Defendant may even

---

4See note 1, *supra*.

have prevailed on such appeals. Must interest be nevertheless inexorably awarded the plaintiff for the entirety of the intervening period before final judgment without the tempering discretion of the judge? Or suppose the defendant tenders at the outset a settlement offer which the plaintiff unreasonably refuses. Under the rule as framed this is irrelevant to the accrual of the interest. *Cf. R.* 4:58–3.

The main rationale advanced for the rule is that it merely transfers to the plaintiff interest which defendant or his insurer was drawing on money which theoretically was due the plaintiff the moment the tort took place or the action instituted. But not all tort defendants are insured; many are insured for subsantially less than the trial award; and many, who are not insured at all or are insufficiently insured, may be relatively impecunious. Torts encompass not only automobile and product liability cases, but defamation, malicious prosecution, interference with economic opportunity, household negligence and miscellaneous other causes of action where insurance may well be non-existent, spotty or inadequate, and where defenses may be advanced in good faith. In such instances the defendant may not have actually earned interest on the award during the intervening period, or on the total amount of the award, and allowance of prejudgment interest on the whole award could well operate oppressively or unfairly. Surely discretion should be reposed in the trial court in all cases to control the matter.

It is difficult to resist the impression that the impelling motivation for adoption of the rule was clearance of trial dockets in automobile and kindred insured-tort situations by imposing coercive pressure on insurance companies to settle cases early. But beyond the observation above that others than insurers may be penalized by the rule, it does not seem fair to assume, as does the rule, that only defendants or their insurers are responsible for unreasonable failures of litigants to arrive at pretrial settlements. The rule may well operate to encourage unreasonable recalcitrance on the part of some plaintiffs. It is a blunderbuss which strikes its objects indis-

criminately and without necessary regard to the justice of its effect in particular cases. In my view it does not, as drawn, subserve justice or promote the interests of calendar control in a justifiable manner. It is, moreover, potentially inconsistent with the policy of *R.* 4:58–3 (settlement offer of party not a claimant).

MOUNTAIN, J., dissenting. I find myself unable to agree with the result reached by the majority and with certain of the views expressed in the plurality opinion. I shall address myself first to the conclusion of the majority that the matter of prejudgment interest is properly the subject of the exercise by this Court of its rule making power.

*R.* 4:42–11(b)[1] provides that in tort actions there shall be included in the judgment, interest at 6% per annum on the amount of the award from the date of the commencement of the suit or from a date 6 months after the date of the tort, whichever is later. The majority concludes that this represents a proper exercise of this Court's rule-making power. I, on the other hand, am convinced that it transcends this power, and should not be allowed to stand as an ongoing rule of court.

The source of this Court's power to promulgate rules of court appears in our Constitution.[2]

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. [*N. J. Const.* Art. VI, § 2, par. 3]

---

[1] Set out fully in the plurality opinion.

[2] The Constitution is not the only source of rule-making power. Courts have the inherent right to adopt rules governing the practice to be followed before the particular court and the manner in which cases shall there be tried. I do not understand it to be argued, however, that reliance is here being placed upon this inherent right, or that the latter is in any way thought to exceed the constitutional grant of power cited above. For a brief history of the exercise by courts in England and in this country of rule-making power pursuant to inherent right, see *Pound, Procedure Under Rules of Court in New Jersey,* 66 *Harv. L. Rev.* 28, 35–36 (1952).

The power is carefully confined to the areas of judicial administration and of practice and procedure in the several courts of the State. It goes no further. Substantive law, or anything touching substantive law, is clearly excluded. That the exclusion is not explicitly stated is quite understandable. It simply did not occur to the draftsmen of the Constitution that a claim would ever be made that the Supreme Court could, by its own rule, effect a change in the substantive law.[3]

Our constitutional grant of rule-making power was definitively interpreted in *Winberry v. Salisbury,* 5 *N. J.* 240, (1950), *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950). This Court there held that the words, "subject to law," were to be interpreted as referring to "substantive law as distinguished from pleading and practice," 5 *N. J.* at 247, and that as so interpreted "the rule-making power of

---

[3]Nor do I know of the claim having been made at any time prior to the adoption of the rule here under discussion. In a leading article upon this subject, cited and quoted in the plurality opinion, the authors have this to say:

Nothing could be clearer than the fact that courts in the exercise of the rule-making power have no competence to promulgate rules governing substantive law. [*Levin and Amsterdam, Legislative Control Over Judicial Rule-Making*: *A Problem in Constitutional Revision*, 107 *U. Pa. L. Rev.* 1, 14 (1958)]

Here the experience in a sister state is instructive. The Constitution of the State of Florida provides that

[t]he practice and procedure of all courts shall be governed by rules adopted by the Supreme Court. [*Fla. Const., Art.* V, § 3, F. S. A.]

As in our Constitution there is no explicit statement that the power does not extend to the area of substantive law. But the Supreme Court of Florida has held that there is implicit in the constitutional grant a limitation that rules must not abridge, enlarge or modify the substantive rights of any litigant. To do so, the court pointed out, would be to ignore the doctrine of the separation of powers and to trespass upon ground exclusively reserved for legislative action. *State v. Furen, Fla.,* 118 *So.* 2d 6 (1960).

Commenting upon *Winberry v. Salisbury, infra,* Dean Heckel said, Obviously, when a court is given rule-making power over practice and procedure in the courts, it is not given power in the area of substantive law. [*Heckel, Constitutional Law, Survey of the Law of New Jersey,* 1950–1951, 6 *Rutgers L. Rev.* 27, 30 (1951)]

the Supreme Court is not subject to overriding legislation, but is confined to practice, procedure and administration as such." 5 *N. J.* at 255. The decision left this Court as the final arbiter with respect to matters of practice and procedure. A rule of court as to any such matter would prevail over a legislative enactment. *George Siegler Co. v. Norton,* 8 *N. J.* 374 (1952). But it was carefully pointed out, and certainly well understood, that this judicial pre-eminence was confined to matters of practice, procedure and judicial administration. Legislative supremacy in the field of substantive law stood unchallenged. "[T]hey [the courts] are not to make substantive law wholesale through the exercise of the rule-making power." *Winberry v. Salisbury, supra,* 5 *N. J.* at p. 248. *Winberry* was one of the most important and certainly one of the most widely discussed decisions that this Court has ever handed down. It was not, at the time, universally accepted. See Note, *The Rule-Making Power: Subject to Law?* 5 *Rutgers L. Rev.* 376 (1951). It was criticized academically. *Kaplan and Greene, The Legislature's Relation to Judicial Rule-Making: An Appraisal of Winberry v. Salisbury,* 65 *Harv. L. Rev.* 234 (1951). It was equally strongly defended. *Pound, Procedure Under Rules of Court in New Jersey, supra,* 66 *Harv. L. Rev.* 28 (1952). My own view of the matter is that *Winberry* has stood the State in good stead. It has permitted the judiciary to develop rules of practice and procedure that are as uniform as possible among the various courts and so flexible as not to impede the reaching of a just result in any particular case, rules that facilitate judicial administration in the interest of litigants and the public generally and that are being constantly scrutinized and readily changed to meet the demands of altered conditions or unforeseen problems. It is no criticism of the Legislature to express a doubt that so much could have been done there. But I can find nothing in *Winberry* to justify what the Court has done here. On the contrary, as I shall endeavor to set forth, the lines of demarcation between

what is proper for this Court to do and what should be solely matter of legislative concern have been ignored and to a considerable extent obliterated. We have trespassed upon the field of substantive law in a purported exercise of the rule-making power and that, at least in my view, we have no right to do.

That the imposition of prejudgment interest is a rule of substantive law seems entirely clear. It effects a change in the law of damages and this is a field of substantive and not procedural law. More importantly, the law of damages forms part of the law of remedies. The award of damages is the remedy most commonly applied in courts of law. Equity affords a greater variety of remedies — rescission, reformation, specific performance, injunction, to name but a few. Surely the body of rules with respect to these and other like remedial devices is substantive law. To illustrate the difference between substance and procedure as applied to a particular remedy, Dean Pound observed in his article in defense of *Winberry,*

> Cases in which injunctions may be granted are a matter of substantive law. The details of procedure in seeking, granting and dissolving them are within the province of the courts. [66 *Harv. L. Rev.* at 46]

Our Legislature has forbidden courts to issue injunctions in cases involving labor disputes. *N. J. S. A.* 2A:15–51, *et seq.* Yet this legislative check upon the free use of the remedy by way of injunction has not called forth any challenge that it usurps this Court's power to deal with matters of procedure. And it is highly unlikely that it will. So with the other remedies mentioned. When and under what circumstances they are to be applied is matter of substantive law. Professor Lynch, in a recent article that is germane to the issue before us, has said.

> No one would seriously argue that the power to surcharge for a specific sum or the power to enjoin is a matter of practice and pro-

cedure. The surcharge and injunction are devices to accomplish the ends of justice. They are specific remedies. [*Lynch, The New Jersey Supreme Court and the Counsel Fees Rule: Procedure or Substance and Remedy?* 4 *Seton Hall L. Rev.* 19, 34 (1972)]

A remedy by way of surcharge is essentially the same as a remedy by the award of damages. And the imposition of pre-judgment interest directly affects the amount of a plaintiff's award. Clearly the rule has changed substantive law.

Or the point may be approached differently. It is said in many cases that laws which fix duties, establish rights and create liabilities are substantive in character, while those which merely prescribe the manner in which rights may be exercised and liabilities enforced in a court are procedural. The rule we are considering certainly creates a new liability. Viewed in this light as well, it is substantive in nature.

At the threshold of any consideration of the proper exercise by the judiciary of its rule-making power is the need to determine the appropriate philosophical viewpoint which should characterize such an exercise. As the plurality opinion very correctly states, there is often no clear line between what is substantive and what procedural. When faced with such a problem, what should be the posture of the courts? They should, in my opinion, defer to the legislature if the matter under consideration can in any clear way be deemed to affect substantive law. There should be a studied deference to what I believe to be a legislative supremacy in all such matters. While I recognize that strict "compartmentalization of power along triadic lines"[4] can probably be achieved only by the political theorist in an exposition of the doctrine of the separation of powers, yet it does remain clear that, while courts share in the work of defining the nature of substantive rights and liabilities when law is determined in the exercise of the adjudicatory process, such definition not only lies at the very heart of the legislative process, but is an area of governance where the legislature clearly has the last word.

[4]Landis, The Administrative Process (1938) 2.

Courts in other states seem to have been consistently conscious — and in some instances perhaps overly conscious — of the importance of maintaining and protecting legislative supremacy in the field of substantive law against any improper intrusion by judicial exercise of the rule-making power. Thus the Supreme Court of Florida deferred to legislation as superseding a conflicting rule of court in the matter of the form of procedure on appeal from an agency to a court, *State v. Furen, supra,* and the Appellate Court of Indiana adopted the view that a statute enumerating the grounds for a new trial took precedence over a rule of court upon the same subject; the court said, "[t]he prescribing of these grounds does not involve a matter of procedure, and no court by decision or rule can modify this statute." *Farmers Mutuals Insurance Co. v. Wolfe,* 142 Ind. App. 206, 233 *N. E.* 2d 690, 692 (1968). While these holdings may seem unduly restrictive of the rule-making power and would presumably not be followed in New Jersey, they do nonetheless evince a deference to the importance of legislation which merits recognition. Perhaps more significant to the present issue is the case of *State v. Michael,* 2 Md. App. 750, 237 *A.* 2d 782 (Ct. of Spec. App. Md. 1968). It was there suggested that limitations on actions might be altered by the judicial rule-making process. The court vigorously rejected the proposal, saying that

. . . the grant of rule making power to the Court of Appeals of Maryland by Section 18A of Article IV of the Maryland Constitution is for the purpose of regulating "practice and procedure." We know of no authority that a statute of limitations comes within such a grant. [237 *A.* 2d at 785]

Although the statute of limitations, as the plurality opinion points out, is sometimes considered procedural, notably for conflict of laws purposes, it has so many substantive features that the decisive position taken by the Maryland court seems eminently correct. Finally, in *State v. Bull,* 249 *A.* 2d 881 (Me. 1969) the Supreme Judicial Court of Maine was

called upon to resolve an apparent conflict between a rule of court and a statute touching the proper form of an indictment. While finding that the rule prevailed, the court was nevertheless moved to say,

The defendant argues that the Supreme Judicial Court in promulgating rules of criminal procedure has no authority to alter or change substantive criminal law. We hasten to agree that the rule-making power is so limited. [249 *A.* 2d at 884]

A frank recognition of legislative supremacy in the field of substantive law, taken together with the limitations upon our rule-making power that are fixed by the Constitution and carefully explicated in *Winberry* should induce this Court to refrain from any exercise of judicial rule-making that may clearly affect substantive law.

This brings me to a further important ground upon which I disagree with the views which here prevail. Throughout much of Part II of the plurality opinion is woven the thread of argument that because the prejudgment interest rule could be adopted in any case coming before the Court where the issue was raised or could be identified, it therefore follows that it may be the subject matter of a rule of court. This argument, I most respectfully submit, inextricably confuses two entirely disparate processes stemming from two quite separate and distinct grants of power.

The rule-making power — limited as it is to matters touching the administration of the courts and to those of practice and procedure — is, in its exercise, very akin to the legislative process. In the formulation of a rule of court, ideally and often actually, experts are consulted, committees study the proposal and submit reports, and various views are sought at Judicial Conferences as well as elsewhere. Finally the rule is adopted. Experience may dictate later revision. In any event the end product is a rule which will apply with undifferentiated force to any of an indefinite number of situations that may later be found to fall within its ambit. The power to undertake this non-adjudicative process

of rule-making stems from Article VI, § II, par. 3 of the Constitution, which is set forth above.

The rendering of an advisory opinion is a form of non-adjudicative judicial lawmaking akin in many respects to the promulgation of a rule. Consider the following critical factors that have been suggested as characterizing the advisory opinion, each of which in greater or less degree is also relevant in the consideration of the process in which a court engages in the formulation of a rule, especially were it to trench upon substantive law.

(a) The sheer multiplication of matters to which attention must be directed, and the resulting dispersion of thought, when a legal proposition is being formulated in the abstract;

\* \* \* \* \* \* \* \*

(c) The importance, in the judicial development of law, of a concrete set of facts as an aid to the accurate formulation of the legal issue to be decided — the weight, in other words, which should be given to the maxim, *ex facto ius oritur;*

(d) The importance of an adversary presentation of evidence as an aid to the accurate determination of the facts out of which the legal issue arises;

(e) The importance of an adversary presentation of argument in the formulation and decision of the legal issue;

(f) The importance of a concrete set of facts in limiting the scope of the legal determination and as an aid to its accurate interpretation;

(g) The diminished scope for the play of personal convictions or preferences with respect to public policy when decision is focused upon a definite legal issue derived from a concrete set of facts;

(h) The value of having courts function as organs of the sober second thought of the community appraising action already taken, rather than as advisers at the front line of governmental action at the stage of initial decision;

(i) The importance of all the factors enumerated in maximizing the acceptability of decisions, and the importance of acceptable decisions. [*Hart and Wechsler, The Federal Courts and The Federal System* (2nd ed. 1973) 67.]

Attention is drawn to these factors, indicative of handicaps under which courts labor when they seek to propound rules of law other than in the course of the adjudicative process, not so much to demonstrate that the handicaps exist — although this fact is not irrelevant — as to demonstrate the

truly real and significant differences in the processes that are
followed in the exercise of the two quite disparate types of
judicial law-making.

How strikingly different from the process of rule making
is the adjudicative process.[5] Here a concrete set of facts is
presented to the court by identified litigants. In this specific
context the issue is precisely delineated. The varied effects
of competing rules of law upon the litigants before the court
bcome apparent. Evidence and argument are presented
through the adversary system. Precedents are studied as to
soundness and pertinence. A rule of law emerging from such
a context carries with it the evidences of its birth, an
especially important consideration when its applicability *vel
non* to a different set of facts is later before a court for de-
cision. The power to undertake this process of law making
in the course of adjudicating actual cases stems from Article
VI, § 1, par. 1 of the Constitution, which reads as follows:

> The judicial power shall be vested in a Supreme Court, a Superior
> Court, County Courts and inferior courts of limited jurisdiction. The
> inferior courts and their jurisdiction may from time to time be es-
> tablished, altered or abolished by law.

It is this allocation of judicial power to the courts, includ-
ing the Supreme Court, that carries with it the power to
make new law in the exercise of the adjudicatory process.
The development of new law in this latter fashion is an
attribute and function of the judicial power.

Thus this Court has been endowed by the Constitution
with two separate and entirely distinct powers through the
exercise of each of which law may be made. The course and
method to be pursued in the exercise of one power are en-

---

[5]I am, of course, in complete accord with the view of the majority
that courts, in the course of deciding cases, make law. The con-
tinuing widespread belief to the contrary is indeed a "stubborn
myth." "I take judge-made law as one of the existing realities of
life." *Cardozo, The Nature of the Judicial Process*, 10.

tirely different from those called into play by the exercise of the other. There is no room for merger or overlap; the two powers, and the manner of their separate exercise, are discrete and distinct.

A further point deserves comment with respect to judicial law making in the course of deciding cases. It is elementary but perhaps worth repeating that here the power of courts to change the law is confined to those areas uncontrolled by legislative enactment. If the legislature has spoken, and the statute is neither unconstitutional nor impermissibly vague, the only function of the court is to interpret the enactment and give it effect. A judge-made law, so reached in the course of adjudication, may in turn be rejected by the legislature; so, too, a judicial interpretation of a statute which the legislature finds unsatisfactory can be altered by an amendatory enactment making clear the legislative intent which the court has failed to perceive. In short, judge-made law, adopted in the course of adjudicating controversies, is at all times subject to legislative supervision and change. The legislature clearly has the last word.

But this is not so as to rules properly promulgated pursuant to the rule-making power of the Supreme Court. As to such rules in this State the Court has the last word.[6] Since this power is properly confined to practice and procedure, it must be assumed that before promulgating a rule the Court has reached a decision that it is moving in the field of adjective law. But if mistakenly, as I believe here to have been the case, the Court should exercise its rule-making power to in fact affect substantive law, it would appear that by so doing it has removed from the reach of our Legislature a matter which is its rightful concern. It needs little imagination to envision the conflicts between coordinate

---

[6]"The only state to assert for its Supreme Court uncontrolled and uncontrollable rule-making power is New Jersey." *Levin and Amsterdam, supra,* at 24.

branches of government which thus portend. Surely this Court should be deeply and sincerely solicitous to avoid any such unseemly confrontation.

For the reasons stated I believe the adoption of the rule of court we are considering to have exceeded the constitutional powers of this Court and accordingly would direct that it be expunged.

I now address myself to Part I of the majority opinion where the Court takes up the issue of prejudgment interest as a matter of adjudication in this case. Perhaps not surprisingly it chooses to adopt a rule exactly the same as the rule previously promulgated. This reveals, I think, the fatuity of adopting a rule as to prejudgment interest in the context of these cases. The only rule as to prejudgment interest that was considered by counsel or the Court was the rule already adopted and here under attack. No alternatives to the existing rule were even suggested. What in effect has been done is to ratify and confirm as law a rule which improvidently came to life in an exercise of rule-making. This awkward and artificial judicial technique has nothing, in my opinion, to recommend it. We should have examined all phases of the problem rather than consider only the rule laid before us. For instance, is not the better rule that which pertains in equity, that the matter of the imposition of inerest be left to the sound discretion of the trial judge in each case? I tend at the moment to think it is. Should the rule also apply to unliquidated contract claims? Can it fairly and justly be applied to all tort claims, as for instance, those for defamation? These and other questions should have been posed and answered before we altered the law in this important respect. I am not in favor of adopting any rule at all with respect to prejudgment interest upon the record before us and in the adjudication of this case.

Both as to the conclusions reached in Part I and Part II of the plurality opinion I respectfully dissent and vote to

strike the interest components from each of the judgments entered below and to direct that *R.* 4:42–11(b) be expunged from our rules of court.

HALL and SULLIVAN, JJ., concur in result.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL and SULLIVAN—5.

*For reversal*—Justice MOUNTAIN and Judge CONFORD—2.