846 F.2d 897
 25 Fed. R. Evid. Serv. 791
 Danny SALAS, a minor, by his mother and Guardian ad Litem,
Maria E. SALAS, Appellants in No. 87-5112
v.
Sun-Mei WANG, M.D.; St. Joseph's Hospital a corporation of
the State of New Jersey, Nicholas Marino, M.D.; Albert
Mall, M.D.; James P. Thompson, M.D.; Mohd A. Siddiqui,
M.D.; James Pascale, M.D.; Thomas E. Potter, M.D.;
Kendrick P. Lance, M.D.; College of Medicine & Dentistry;
Rowena Li, M.D.; Sister Jane Frances Brady; Sister Robert
Clare Swartz, R.N.; Mary Kowal, R.N.; Dawn Schwartz, R.N.;
Cheryl Daniels, R.N.; Dawn Campbell, R.N.; Jane Mullaney,
R.N.; Nina Grossi-Halstead, R.N.; Lynn Pascal, R.N.; and
Patricia Lia, R.N., jointly, severally and in the alternative.
Appeal of Nicholas MARINO, M.D., Appellant in No. 87-5059.
Appeal of Nina GROSSI-HALSTEAD and Cheryl Daniels,
Appellants in No. 87-5084.
Appeal of Sun-Mei WANG, M.D., Appellant in No. 87-5099.
 Nos. 87-5059, 87-5084, 87-5099 and 87-5112.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1987.
Decided May 16, 1988.
 
 Arnold J. Ginsberg (argued), Edward A. Perse, Horton, Perse & Ginsberg, Edward C. Ratiner, Ratiner & Glynn, P.A., Miami, Fla., for appellant Danny Salas.
 George J. Kenney (argued), Patrick J. McAuley, Connell, Foley & Geiser, Roseland, N.J., for appellee Nicholas Marino, M.D.
 Peter A. Greene (argued), Douglas F. Ortelere, Feuerstein, Sachs, Maitlin & Fleming, West Orange, N.J., for appellees Cheryl Daniels, R.N. and Nina Grossi-Halstead, R.N.
 John L. Shanahan, Shanahan & Schussell, Roseland, N.J., for appellee Sun-Mei Wang, M.D.
 Before BECKER, SCIRICA and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These are appeals from the judgment of the district court in a medical malpractice action founded on diversity of citizenship. The appeals (and cross appeal) followed a $6.5 million jury verdict in favor of the plaintiff, Danny Salas, by his mother and guardian ad litem, Maria E. Salas, who sued alleging that Danny had become severely brain damaged as a result of the defendants' negligence in failing to recognize and respond to early signs of fetal distress and in failing properly to resuscitate Danny immediately after birth. Named as defendants were doctors and nurses at Saint Joseph's Hospital ("the Hospital") in Paterson, New Jersey, and the Hospital itself.
 
 
 2
 The jury returned its verdict against Drs. Sun-Mei Wang and Nicholas Marino and Nurses Cheryl Daniels, Nina Grossi-Halstead, and Patricia Lia, and it apportioned the verdict among these defendants. By order entered January 7, 1987, the district court granted Nurse Lia's motion for judgment n.o.v., but denied the other defendants' motions. At the same time, the court granted plaintiff an award of prejudgment interest, but only on the portion of the damages that accrued between the filing of the complaint and the entry of judgment. The court did not award prejudgment interest for damages (largely medical and personal care expenses) that would accrue over Danny's life expectancy.
 
 
 3
 Asserting that there was insufficient evidence of their involvement in the tortious conduct, defendants Daniels and Grossi-Halstead appeal the district court's denial of their motion for a directed verdict at the close of the evidence. Because there is evidence from which a reasonable jury could conclude that Nurse Daniels was negligent, we will affirm the district court's denial of her motion. However, because insufficient evidence exists regarding Nurse Grossi-Halstead, we conclude that the district court committed reversible error in denying her motion for a directed verdict, and we will reverse and direct the entry of judgment for Grossi-Halstead.
 
 
 4
 Defendants' appeal of the district court's denial of their new trial motion presents two questions. The first question is whether the district court abused its discretion in allowing the plaintiff's expert economist to testify as to the (projected) elements of future damages, to calculate the present value of the damages, and to present an aggregate damages figure. We reject the defendants' argument that New Jersey substantive law rather than the Federal Rules of Evidence applies to this question, and determine that the district court did not abuse its discretion in admitting the evidence under the federal rules. The second question is whether plaintiff's counsel's closing argument, which beseeched the jury, "Please, don't let Danny die," (from lack of an adequate damages award to sustain his life) unfairly prejudiced the verdict. Viewing the record as a whole, we conclude that it did not.
 
 
 5
 Plaintiff's cross-appeal raises the question whether the district court correctly applied the New Jersey prejudgment interest rule. The district court concluded that because the great majority of Danny's damages would accrue after the date of the entry of judgment, this was an "exceptional case" warranting application of prejudgment interest only to damages which were "out of pocket" between the date of the filing of the complaint and the entry of judgment but not on damages (principally medical care) to accrue in the future. Subsequent to the district court's decision, the New Jersey Supreme Court in Ruff v. Weintraub, 105 N.J. 233, 519 A.2d 1384 (1987), made it clear that prejudgment interest may not be suspended based on a finding that damages will not accrue until a future time. Because the district court did not reach the question whether other circumstances support suspending prejudgment interest, we will vacate the prejudgment interest order and remand to the district court for a consideration of whether there are alternative grounds for a finding that this is an "exceptional case."
 
 
 6
 We thus affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 7
 Maria Salas, Danny's mother, was under the care and treatment of defendant Dr. Wang, an obstetrician and gynecologist on the medical staff of St. Joseph's Hospital, for the period of her pregnancy beginning in January 1978. At approximately 7:50 p.m. on July 30, 1978, Maria Salas was admitted to the Hospital in active labor. Dr. Wang was in charge of the delivery. Also on duty that evening were Dr. Marino, the hospital's chief resident in obstetrics, and Nurse Kowal, the assistant to Dr. Wang in the labor and delivery rooms.
 
 
 8
 Abnormalities were detected both before and after entry into the delivery room. At 8:50 p.m., Dr. Wang ruptured Maria Salas' membranes and observed thick meconium (fetal feces). Dr. Wang testified at trial that the presence of stained amniotic fluid was indicative of the possibility that the newborn baby would suffocate on aspirated meconium. Moreover, the fetal monitor indicated a rapid fetal heart rate, which, according to hospital documents, raises "the possibility ... that some danger to the baby has arisen." J.A. at II-69. Plaintiff's experts testified at trial that Dr. Wang should have performed a caesarean section instead of proceeding with a vaginal delivery under these circumstances. Although Dr. Wang decided against a caesarean delivery, she instructed Nurse Kowal to notify the intensive care nursery ("ICN") of an impending high risk delivery.
 
 
 9
 The ICN was responsible for providing an emergency team, composed of a nurse and a physician specializing in neonatal care, to provide immediate resuscitation in the event of a high-risk birth. Testimony at trial indicated that the ICN team could have reached the delivery room within roughly one minute of receiving an emergency call. Although the testimony was in conflict about the number and actual times of Nurse Kowal's contacts with the ICN, and although the medical records were subsequently altered and were unhelpful, there is no dispute that Kowal called the ICN on three separate occasions. A warning call was placed at 8:50 p.m., in which Kowal instructed Nurse Daniels, the ICN charge nurse responsible for ensuring that the ICN unit was notified of the request, to place the emergency team on alert. Kowal, at Dr. Wang's direction, contacted Daniels a second time at 10:30 p.m. to repeat her earlier warning and to inform Daniels that Maria Salas was being moved into the delivery room. Kowal testified that she made her third and final call to Daniels at approximately 11:08 p.m. in which she told Daniels to send the emergency team down immediately.
 
 
 10
 Delivery occurred at 11:27 p.m. For reasons that remain unexplained, the ICN team, consisting of Dr. Siddiqui and an unidentified nurse, failed to arrive until approximately 11:30 p.m., several minutes after delivery. Dr. Wang withdrew the baby from his mother and attempted to commence suctioning the remaining meconium. However, she was prevented from doing so by Dr. Marino, who seized the child from her and began the suctioning process himself. Prior to completion of the meconium removal process, Dr. Marino administered positive oxygen pressure because he noticed that the baby had not commenced breathing and was beginning to show signs of suffering from oxygen depletion (a condition known as cyanosis). Testimony was offered to show that the application of positive oxygen pressure may have forced some of the remaining meconium into the baby's lungs. At this point, the ICN team assumed the care of the child and Dr. Siddiqui removed additional meconium. Dr. Siddiqui did not testify at trial, and the ICN team nurse was never identified.
 
 
 11
 It is undisputed that Danny suffers from permanent brain damage. As the district court described it: "He is totally nonambulatory and profoundly mentally retarded. He is unable to care for most of his basic physiological needs and has difficulty eating and drinking because of pseudobulbar palsy. He has little understanding and no communication ability." J.A. at I-47. There was testimony at trial that the aspirated meconium and subsequent oxygen deprivation contributed to the brain damage.
 
 
 12
 Plaintiff's theory, as alleged in the complaint, was that: (1) Drs. Wang and Marino were negligent in the manner in which they treated Maria Salas during labor and delivery; (2) Dr. Marino was negligent in his efforts to resuscitate Danny after delivery; (3) Nurse Kowal was negligent in the performance of her duties as a delivery room nurse; and (4) Nurses Daniels, Grossi-Halstead, Pascale, and Lia were negligent either for failing to arrange for the presence of the ICN team in the delivery room or for failing themselves to appear there in a timely manner after being advised to do so.
 
 
 13
 One of the questions before us arises out of the plaintiff's presentation of expert testimony as to damages. Lawrence S. Forman, a rehabilitation counsellor and expert witness for plaintiff, testified as to an itemized list of services he felt were necessary for Danny's medical care. The list, which was introduced into evidence, included the amount, frequency, and current cost of the care. An expert economist, Dr. Irving Goffman, then testified as to the cost of a program of care for Danny and to his loss of earning capacity resulting from his injuries. The district court had earlier ruled, over the objections of appellants, that Dr. Goffman would be permitted to testify as to the projected aggregate dollar amounts of these damages and he did so.
 
 
 14
 In making his assessment of the costs of Danny's care, Dr. Goffman relied on Forman's conclusions regarding "what Danny Salas is going to need, how many times, for how long, and what the current price of these particular goods and services would be." Defendants-Appellants' Br. at 12. Using a chart listing the types of care identified by Forman, Goffman testified as to the cost of each of the types of care, and filled in columns on the chart as to the projected cost, based on a 63-year life expectancy. After explaining the concept of reduction to present value, Goffman then testified as to the present value for each type of care[1] and that the total cost of Danny's health care would be $140,280,284, which he reduced to a present value of $6,544,629. The charts were subsequently admitted into evidence.
 
 
 15
 On October 3, 1986, the jury returned a verdict in the amount of $6.5 million against the defendants with liability apportioned in the following manner:
 
 
 16
 SunMei Wang, M.D. 55%
Nicholas Marino, M.D. 30%
Cheryl Daniels, R.N. 6%
Nina Grossi Halstead, R.N. 6%
Patricia Lia, R.N. 3%
 
 
 17
 Nurses Kowal and Pascale were found not liable. Then by order filed January 6, 1987, the district court granted the motion of Nurse Lia for judgment n.o.v., and denied motions of Dr. Marino and Nurses Daniels and Grossi-Halstead for a new trial and remittitur. The court also granted plaintiff's motion for prejudgment interest and allowed it "at the rate of 12% per annum on the sum of $372,431 from December 14, 1983, until October 6, 1986, [the date of entry of the verdict] in the case of defendants Marino, Grossi-Halstead and Daniels, and from May 16, 1983 until October 6, 1986, in the case of defendant Wang." J.A. at I-65.[2]
 
 
 18
 Dr. Marino and Nurses Daniels and Grossi-Halstead appeal from the judgment and denial of the motion for new trial. Plaintiff cross-appeals from the district court's order denying prejudgment interest for unaccrued damages.
 
 
 19
 II. SUFFICIENCY OF EVIDENCE OF THE NURSES' INVOLVEMENT
 
 
 20
 (DENIAL OF MOTION FOR DIRECTED VERDICT)
 
 
 21
 At the close of the evidence, the district court denied a motion by Nurses Daniels and Grossi-Halstead for a directed verdict pursuant to Fed.R.Civ.P. 50(a). Daniels and Grossi-Halstead argue that we should reverse the district court's ruling and direct a verdict for them because plaintiff presented insufficient evidence that the nurses caused the ICN team's late arrival. Our review of the district court's denial of a motion for directed verdict is plenary. Maggipinto v. Reichman, 607 F.2d 621, 624 n. 7 (3d Cir.1979). The district court must grant the motion for directed verdict if, after examining the record in a light most favorable to the plaintiff and reviewing speciftc evidence in the record and all inferences reasonably capable of being drawn therefrom, it finds that, as a matter of law, the record lacks the minimum quantum of evidence from which a jury might reasonably afford relief. Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969). In Hunziker v. Scheidemantle, 543 F.2d 489 (3d Cir.1976), we held that "[a] directed verdict should not be granted for a defendant 'if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability.' " Id. at 494 n. 8 (quoting Dougherty v. Hooker Chem. Corp., 540 F.2d 174, 178 (3d Cir.1976)).
 
 
 22
 Daniels and Grossi-Halstead maintain that the evidence "leaves a large knowledge gap" between Nurse Kowal's 11:08 call to Nurse Daniels requesting that the ICN team be sent to the delivery room immediately and the appearance of the ICN team in the delivery room approximately twenty-two minutes later. Defendants-Appellants' Br. at 12. They maintain that the record was deficient as to what happened during that twenty-two minute period, and that, because plaintiff bore the burden of proving their negligence by a preponderance of the evidence, the "jury cannot be permitted to guess" whose negligence caused the delay. Id.
 
 
 23
 The nurses cite Hahn v. Atlantic Richfield Co., 625 F.2d 1095 (3d Cir.1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981), for the proposition that a directed verdict for the defendants must be granted where the evidence does not permit the jury to infer which among several "conceivable possibilities" may have occurred. Id. at 1099. In Hahn, a breach of warranty action against a hoist manufacturer by a pipefitter who was crushed when a one-ton hoist fell on him, the plaintiff, in order to recover against the defendant manufacturer, was required to prove that the manufacturer sold the hoist to the plaintiff's employer, Fluor Engineers and Contractors. According to the Hahn panel, "[t]here [was] simply no evidence, either direct or circumstantial, that would indicate how Fluor came to possess the hoist." Id. The panel determined that the district court abused its discretion when it denied a directed verdict, because the jury was forced to select among several "conceivable possibilities, none of [which] can be properly inferred from the evidence presented at trial." Id. The nurses maintain that the jury in the case sub judice similarly was forced to speculate among three possibilities: (1) that the phone calls from Nurse Kowal were never made; (2) that Nurse Daniels or Nurse Grossi-Halstead received the calls but failed to alert the ICN team; or (3) that the ICN team was properly notified but failed to reach the delivery room on time. Because the evidence differs regarding Daniels and Grossi-Halstead, we will consider their arguments in turn.
 
 
 24
 Daniels maintains that the only evidence against her is that she received three phone calls, and that it is no more likely that her alleged negligence led to the late arrival of the ICN unit than did that of Dr. Siddiqui, Grossi-Halstead, or the unknown nurse who accompanied Dr. Siddiqui to the delivery room. Dr. Siddiqui did not testify at trial. Daniels testified that she was the charge nurse (the nurse responsible for making staff assignments) in the ICN from 3 p.m. until 11:30 p.m. on July 30, 1978, the night of Danny's birth, and that as charge nurse she was responsible for contacting the ICN nurse and physician who comprise the ICN team and to inform them to go to the delivery room. At trial, Kowal testified that she called and spoke to Daniels three times. Although Daniels testified that she did not recall the conversations, she did not deny that they occurred.
 
 
 25
 We conclude that the jury could have found that Daniels received each of the phone calls, that she failed to notify the ICN team in a timely fashion, and that failure to contact the ICN team in a timely fashion could have resulted in its failure to arrive in time to assist Danny. Moreover, the jury could have found that Daniels' failure to remember any of the events of July 28--events which must have been quite memorable--cast doubt on her credibility as a witness. Additionally, although the events surrounding the failure of the ICN team to arrive are unclear, the jury reasonably could also have inferred that because Daniels appeared to be concealing her knowledge of the events of July 28, her negligence was a proximate cause of the ICN team's failure to arrive. Hahn v. Atlantic Richfield is distinguishable because there is evidence in this record from which the jury could conclude that Daniels, not Kowal or the ICN team, was a cause of the failure of the team to arrive. Thus, there is evidence "reasonably tending to support" one of plaintiff's theories of recovery, Dougherty, 540 F.2d at 178, and we therefore conclude that the district court did not abuse its discretion in denying Nurse Daniels' motion for directed verdict.
 
 
 26
 Nurse Grossi-Halstead's appeal presents a much closer case. Grossi-Halstead maintains that "not a single shred of evidence" links her to any negligent act. Defendants-appellants' Br. at 12. On the night of July 30, 1978, Grossi-Halstead was the charge nurse on the 11:15 p.m. to 7:15 p.m. shift, overlapping with Daniels for the critical period from 11:15 to 11:30 p.m. In response to the question whether she recalled the time at which she came in on July 30, Grossi-Halstead testified that she "normally" arrived fifteen minutes early. Plaintiffs-Appellees' App. at 13a. However, the only testimony possibly linking Grossi-Halstead to the failure of the ICN team to arrive was the testimony of delivery room nurse Alice Byorick that she saw Kowal telephoning the ICN at approximately 11:15 p.m., at which time Daniels was still present. The record does not indicate that Kowal made a fourth call to the ICN.
 
 
 27
 Kowal never testified that she spoke with Grossi-Halstead, but rather identified Daniels as the recipient of each of her three calls. Grossi-Halstead testified that she did not remember receiving any such call from Kowal or a message from Nurse Daniels regarding the earlier phone calls. Plaintiff's contention is: (1) that Kowal made the fourth call to the ICN no earlier than 11:15 when Grossi-Halstead's shift started; (2) Grossi-Halstead was on duty at this time; (3) she answered the telephone; and (4) she negligently failed to alert the ICN in timely fashion. But this is completely speculative and there is insufficient evidence to support this theory. We therefore conclude that the district court erred in denying Grossi-Halstead's motion for a directed verdict, and we will direct the district court to enter judgment for Grossi-Halstead.
 
 III. DENIAL OF THE NEW TRIAL MOTIONS
 
 28
 Defendants Marino, Daniels and Grossi-Halstead moved for a new trial following the jury's verdict. The district court rejected the motion on several grounds. Only two parts of the order have been appealed: (1) the district court's ruling allowing Danny's expert economist, Dr. Irving Goffman, to testify as to the total amount of economic damages; and (2) the allegedly prejudicial effect of plaintiff's counsel's closing remarks to the jury. We apply abuse of discretion review to the district court's evidentiary rulings, In re Japanese Electronic Products, 723 F.2d 238, 260 (3d Cir.1983), rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and its denial of the motion for new trial, Giordano v. McCartney, 385 F.2d 154, 155 (3d Cir.1967) (per curiam ).
 
 A. Evidence of Aggregate Damages
 
 29
 Defendants argue on appeal that the court committed prejudicial error in determining that the Federal Rules of Evidence applied and thereby permitting Dr. Goffman to testify as to the aggregate dollar damages that the jury should award for Danny's economic losses. The challenged testimony reads:Question: Dr. Goffman, if we were to add those figures up, could you tell us, based on the report that you were supplied by Mr. Forman concerning Danny Salas' future needs, could you tell us, first, what the total actual cost of that program is for him over his lifetime?
 
 
 30
 Answer: Yes. From October 1st, 1986 through December 31, 2049, all projected, future costs beginning next week, the total cost over the lifetime would be $140,280,204, with a present value of $6,544,629.
 
 
 31
 This is what it will take today, $6,544,629 to fund a lifetime expenditure of $140.2 million.
 
 
 32
 Nurses Br. at 18. Defendants argue that it was not only error to admit this aggregation testimony but also that the error was compounded by admitting into evidence the charts reflecting these amounts and by allowing counsel to repeat these figures in his summation.
 
 
 33
 At the threshold, defendants maintain that the district court erred in refusing to apply New Jersey substantive law pertaining to the introduction of aggregate damages. They assert that evidence of gross figures purporting to be a projection of the plaintiff's aggregate damages are inadmissible in New Jersey. See Tenore v. Nu Car Carriers, Inc., 67 N.J. 466, 341 A.2d 613 (1975). Tenore concluded that expert testimony regarding the impact of inflation on the plaintiff's future losses is admissible but that "introduction in evidence of tables prepared by the expert witness purporting to show plaintiff's aggregate damages" is improper. Id., 341 A.2d at 622. The Tenore court concluded that the introduction of charts showing aggregate damages was improper because "the tables assume fact findings not within the peculiar expertise of the economic expert.... [and] the projection of a gross figure before the jury submitted by an expert tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs." Id. Defendants argue that "[u]nder Tenore, Goffman's testimony should have been limited to an explanation of inflationary trends and discount rates generally. He should not have been permitted to apply his projected inflation and discount rates to the costs set forth in the Forman report to project ultimate costs...." Marino Br. at 26.
 
 
 34
 Plaintiff maintains that the Federal Rules of Evidence apply and permit testimony of aggregate damages. At the outset, we will consider whether the federal rules conflict with Tenore, because under Hanna v. Plumer, 380 U.S. 460, 472, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965), if the rules conflict we must apply the federal rules so long as they are "rationally capable of classification" as procedural. We conclude that the rules conflict and that the testimony of aggregate damages here was permissible under the federal rules for three reasons.
 
 
 35
 First, insofar as the federal rules are designed to provide for expeditious and efficient proceedings, see Fed.R.Evid. 102, permitting testimony of aggregate damages can only serve these goals. Second, expert testimony is permissible where it will be helpful to the jury. Fed.R.Evid. 702 (testimony permissible where "specialized knowledge will assist the trier of fact" ).[3] Surely performing present value calculations could have assisted the jury here. Had the aggregate damages been excluded, the jury would simply have been presented with the individual damage items identified by the expert and would have had to make the proper present value calculation by itself (presumably guided by instruction from the court or expert testimony on how to perform the calculation). But it would have been more efficient and exact to have the expert do the calculation, and in our view, the spirit as well as the letter of the federal rules makes it appropriate that the district court permit the expert to do so.
 
 
 36
 Third, to the extent that the aggregation is considered to be testimony as to an ultimate issue, Rule 704 specifically permits an expert to testify as to ultimate issues. Fed.R.Evid. 704.[4] We have considered the defendants' argument that the projection of a gross figure by an expert may have an undue effect on the jury, but we are unimpressed. That argument too is at odds with both the letter and the spirit of the federal rules, which encourage the use of expert testimony to render trials more rational and efficient. See In re Japanese Electronic Products, 723 F.2d 238 (3d Cir.1983), rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[5] Indeed, we are far from certain that Tenore, even if applicable, would dictate the result that defendants advance.[6]
 
 
 37
 Because New Jersey law and the Federal Rules of Evidence arguably conflict, we must determine which law applies. In Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Supreme Court stated that
 
 
 38
 the constitutional provision for a federal court system (augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either.
 
 
 39
 Id. at 472, 85 S.Ct. at 1144 (citation omitted). The Federal Rules of Evidence, although first proposed by the Supreme Court, were enacted into law by Congress, Act of Jan. 2, 1975, Pub.L. 93-595, 88 Stat. 1926 (1975), to "govern proceedings in the courts of the United States." Fed.R.Evid. 101. In Hanna, the Supreme Court held that in a diversity case where a federal and a state rule govern the disputed issue and are in direct conflict, the federal rule must be applied if it meets the "rationally capable of classification [as procedural]" test, or, in the words of Justice Harlan, if it is "arguably procedural." 380 U.S. at 476, 85 S.Ct. at 1146 (citation omitted) (Harlan, J., concurring).[7] We are thus bound to apply the federal rules so long as they can rationally be viewed as procedural.[8]
 
 
 40
 The commentators have observed that the rules of evidence are largely procedural. See C. Wright, A. Miller & E. Cooper, 19 Federal Practice & Procedure Sec. 4512, at 193 (1982) ("all of the Evidence Rules can rationally be viewed as rules of procedure" ). In accordance with that view, we have applied the federal rules to the admissibility of documentary evidence in a diversity case. Pollard v. Metropolitan Life Ins. Co., 598 F.2d 1284, 1286 (3d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979). Moreover, the district court correctly concluded that in Dudley v. South Jersey Metal, Inc., 555 F.2d 96 (3d Cir.1977), we held to be procedural a rule regarding the admissibility of expert testimony on aggregate damages, such as the rule set forth in Tenore.
 
 
 41
 In Dudley, a diversity case in which the trial took place in the District of New Jersey before the adoption of the Federal Rules of Evidence, New Jersey's conflicts rule applied. We held that under New Jersey's conflicts rule Pennsylvania substantive law governed the rights of the parties. Id. at 102 (citing Zotta v. Otis Elevator Co., 64 N.J.Super. 344, 165 A.2d 840 (App.Div.1960)). Nevertheless, we applied Tenore regarding the presentation of aggregate figures, concluding that "since this trial was conducted prior to the adoption of the Federal Rules of Evidence, the district court was obligated to apply the rules of evidence of the forum state, Fed. Rules of Civ.Pro. 43(a), 28 U.S.C." Id. (citation omitted).[9] Had we decided that the issue was one of substantive law, we would have been bound to apply the law of Pennsylvania. Instead, we explicitly overruled the district court's decision, which had applied Pennsylvania law (permitting aggregate dollar damage testimony), and we noted that Pennsylvania's law was "completely irrelevant on this issue." Id. at 103.
 
 
 42
 By concluding that the Tenore rule applied and by rejecting application of Pennsylvania substantive law, we implicitly concluded that it was not a matter of substantive law. The district court in the case sub judice thus correctly concluded that we have already determined the Tenore rule to be a matter of procedural law. We now conclude that its counterpart in the federal rules is procedural and that, for the reasons set forth above, the district court did not abuse its discretion in allowing testimony of aggregate damages.[10]
 
 B. Closing Argument
 
 43
 Defendants argue that a new trial is required because plaintiff's counsel improperly appealed to the sympathy of the jury in the closing argument. Counsel referred to the projected $6.5 million costs for Danny's care as necessary for "just keeping him alive," and added that "I have never said it with greater conviction. Truly you have his life in your hands today. You've got to do the right thing. You've got to do the right thing the first time. This is the only time. Please don't let Danny die." Plaintiff-Appellee's App. at 58a-59a.
 
 
 44
 Defendants' counsel moved for a mistrial based upon the potential prejudice of the closing argument. On appeal, defendants maintain that the statement was inaccurate and improperly appealed to the jury's emotions.[11] The district court denied the motion in its January 6 order, and in the opinion accompanying the order stated that "[h]ad I been consulted in advance of the closing argument and asked to rule on that argument, I probably would not have permitted it," but that it was not grounds for a new trial. J.A. at I-55.
 
 
 45
 As to the contention that the statement was inaccurate, the district court disagreed, concluding that because Dr. Marino presented evidence that Danny would not live long, and because plaintiff presented evidence that without the proper care Danny would die but that with proper care he might have a normal life expectancy, the statement was not inaccurate. As to the potential prejudice arising from the appeal to the jury's emotions, the district court noted that the statement "tends toward the emotional rather than the reasoning process," J.A. at I-55, but because the trial had already exposed the jurors to highly emotionally charged conditions, the court concluded that "[t]here was very little, if anything, that mere words of a lawyer could do to affect their emotions at that point." Id. at I-56.
 
 
 46
 An evidentiary ruling is not reversible error "unless a substantial right of a party is affected." Fed.R.Evid. 103(a). See also Fed.R.Civ.P. 61 ("No error ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice."). We set forth the standard for granting a new trial based on prejudicial statements of counsel in Draper v. Airco, Inc., 580 F.2d 91, 94-95 (3d Cir.1978) (footnote omitted) (citations omitted):
 
 
 47
 We recognize that the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial.... The remarks of counsel here, however, so far exceed the bounds of proper argument that we are bound to reverse the district court.
 
 
 48
 In reaching this conclusion, we wish to emphasize that we do not expect advocacy to be devoid of passion. A life has been lost here and the family is entitled to have someone speak with eloquence and compassion for their cause. But jurors must ultimately base their judgment on the evidence presented and the rational inferences therefrom. Thus, there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice.
 
 
 49
 Appellants maintain that Danny's counsel's statement exceeds the "limits to pleas of pure passion" we identified in Draper. We find the case easily distinguishable, however, because the closing in Draper involved not one impassioned comment, but four specific improprieties: (1) improper and prejudicial references to the defendants' wealth; (2) expressions of counsel's personal opinion of the justness of his client's cause; (3) references to facts not in the record; and (4) disparaging references to opposing counsel, including a charge that they participated in a conspiracy. Appellants here point only to the comment "don't let Danny die" and the remarks that preceded it, which pale in comparison to the four improprieties listed above.
 
 
 50
 In McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir.1985), we held that errors in civil cases are harmless if it is highly probable that they did not affect a party's substantial rights. We agree with the district court that Danny's counsel's remarks were inappropriate and should not have been permitted, but they did not affect substantial rights. The jury was subjected to extensive testimony over the course of the trial regarding Danny's physical status and care, and thus, as the district court stated, was fully able to evaluate the accuracy of counsel's statement. The possible prejudicial effect arising from the statement's highly charged emotional appeal is more problematic. The statement could be interpreted to indicate that the jury should find for Danny to enable him to live, regardless of the proper application of the law to the facts. However, the district court, after observing first hand the lengthy trial and emotionally wrenching testimony of numerous witnesses, concluded that this one isolated statement did not lead the jury to believe that it would be guilty of Danny's death if it did not find for him.
 
 
 51
 We agree and will affirm the district court's refusal to grant a new trial on the basis of the closing argument.
 
 IV. PREJUDGMENT INTEREST
 
 52
 New Jersey Civil Practice Rule 4:42-11(b) provides as follows:
 
 
 53
 [T]he court shall, in tort actions, including products liability actions, include in the judgment simple interest [at 12% per annum on the amount of the award] from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.
 
 
 54
 4:42-11(b) (emphasis added). The district court, applying New Jersey court rule 4:42-11(b), assessed prejudgment interest against Doctors Wang and Marino and Nurses Grossi-Halstead and Daniels, but concluded that this was an exceptional case because unlike most cases, in which substantial portions of the damages were incurred before the date of judgment, the great majority of the damage award consisted of future damages. The court wrote: "[t]he bulk of the damages in the present case must be on account of medical and personal supplies and services which will have to be provided to Danny during the next half century," and "only a small fraction of these expenses" had been incurred to date. J.A. at I-59. As a result, the court suspended the running of the prejudgment interest for all unincurred damages.
 
 
 55
 The court calculated the amount that Danny was "out-of-pocket" at the time of judgment by totaling the amount of damages that plaintiff's economist, Goffman, testified had arisen in the years 1984, 1985, and 1986. The court determined the total to be $372,431 and then applied the 12% prejudgment interest rate to that total.[12]
 
 
 56
 In the cross-appeal, plaintiff seeks reversal of the district court's order, and seeks an award of prejudgment interest on the total amount of damages, an assessment which would add roughly 40% to the judgment, an increase of some $2.4 million. Plaintiff contends that the judge misapplied New Jersey law in determining that "exceptional circumstances" justified awarding prejudgment interest only for damages that arose from prejudgment injuries. According to plaintiff, the Supreme Court of New Jersey has rejected the distinction between prospective and out-of-pocket losses for purposes of awarding prejudgment interest. Ruff v. Weintraub, 105 N.J. 233, 519 A.2d 1384 (1987). Defendants, of course, seek affirmance of the district court's prejudgment interest determination. We review the award of prejudgment interest in a proceeding involving unliquidated damages for abuse of discretion. Feather v. United Mine Workers, 711 F.2d 530, 540 (3d Cir.1983).[13]
 
 
 57
 The original New Jersey prejudgment interest rule, which went into effect on January 31, 1972, mandated, in cases not involving a public entity or employee, that prejudgment interest be awarded with no exceptions. See Ford v. Garvin, 127 N.J.Super. 391, 317 A.2d 425, cert. denied, 65 N.J. 566, 325 A.2d 700 (1974). The rule was amended in 1975 to give the trial court the discretion to suspend prejudgment interest in "exceptional cases." See Kotzian v. Barr, 152 N.J.Super. 561, 378 A.2d 256, 258 (App.Div.1977), rev'd on other grounds, 81 N.J. 360, 408 A.2d 131 (1979).[14] Although authority on the exceptional case issue is sparse, New Jersey courts have found exceptional circumstances on the basis of "[e]quitable considerations ... when plaintiff is at fault or the litigation is delayed by court order ... or where defendant is not fully insured." Pavoll v. Island Petroleum, 204 N.J.Super. 99, 103, 497 A.2d 919, 922 (Law Div.1985) (citations omitted).
 
 
 58
 The New Jersey Supreme Court's most recent pronouncement on exceptional cases came in Ruff v. Weintraub, 105 N.J. 233, 244-46, 519 A.2d 1384, 1390-91 (1987). In Ruff, plaintiff was involved in a car accident with several other drivers. She was awarded $650,000, which included $300,000 for lost wages (past and future), $300,000 for pain and suffering, and $50,000 for medical expenses. Her husband was awarded $100,000 for loss of consortium. The trial court subsequently added prejudgment interest to both awards. The Appellate Division affirmed the trial court's exclusion of evidence of net, as opposed to gross, income figures, and also affirmed the award of prejudgment interest. Id. at 237, 519 A.2d 1384. The New Jersey Supreme Court reversed, holding that the proper measure of damages for lost future income is net income, and, as to prejudgment interest, took the "opportunity to comment on the issue." Id. at 244, 519 A.2d 1384.
 
 
 59
 Albeit in dictum, but in no uncertain terms, the court considered and rejected the possibility that exceptional circumstances exist where much of the verdict consists of future damages. According to the court, exceptional circumstances exist " 'only where it is demonstrated that the policy, spirit and intent of the rule are patently inapposite to the circumstances at hand.' " Id. at 245, 519 A.2d 1384 (quoting Kotzian, 152 N.J.Super. at 565, 378 A.2d 256). The court stated that two policies underlie the prejudgment interest rule. First, the rule is designed "to compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier." Id. 105 N.J. at 244-45, 519 A.2d 1384 (citing Busik v. Levine, 63 N.J. 351, 307 A.2d 571, 575, appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); Kotzian, 152 N.J.Super. at 565, 378 A.2d 256).[15] Second, the rule is designed to discourage defendants' delay by " 'induc[ing] prompt defense consideration of settlement possibilities.' " Id. 105 N.J. at 245, 519 A.2d 1384 (quoting Busik, 63 N.J. at 359, 307 A.2d 571). Thus, the rule serves to ameliorate court congestion. Bellino v. Strelecki, 121 N.J.Super. 331, 297 A.2d 15, 16 (Law Div.1972). These policies are to guide judges in exercising their discretion in deciding whether to grant prejudgment interest. See Kotzian v. Barr, 408 A.2d at 133.
 
 
 60
 In Ruff, the court determined that the compensation rationale did not apply because the plaintiffs' recovery was largely for damages that would arise in the future. The court determined, however, that the second prong, encouraging settlements, "is an adequate independent basis for the application of the prejudgment interest rule in this case," and thus that the case was not "exceptional" within the meaning of the Rule. 105 N.J. at 245, 519 A.2d 1384.[16]
 
 
 61
 We conclude that Ruff, which was decided after the district court's order in the case sub judice, requires us to vacate the district court's determination that the large future damages component of the judgment constitutes grounds for finding this to be an exceptional case. In fairness, however, the district court could not have anticipated Ruff, and hence did not reach the question whether other circumstances might exist and be sufficient to suspend the award of prejudgment interest under the Rule.[17] Among the circumstances that may be considered are the effect of the plaintiff's delay in naming certain defendants or the reasonableness of the defendants' failure to settle. Additionally, the potential for settlement may have been affected by the plaintiff's adoption of a widely scattered "shotgun" approach in naming twenty-one parties as defendants, many of whom were dismissed with or without prejudice, several of whom were found not liable by the jury, or as a matter of law by the district court, and one of whom, Grossi-Halstead, we determined should have had the benefit of a directed verdict. We therefore will remand the question to the district court for a hearing to determine whether alternative grounds exist for the finding that this is an exceptional case.[18]
 
 V. CONCLUSION
 
 62
 For the above reasons, we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 The chart included the following information:
 Danny Salas: Economic Losses
 Projected Cost Present Value
Medical Evaluations 11,953,382 445,575
Medical Care 1,510,412 56,840
Hospital Care 8,434,054 293,306
Therapy 2,362,710 787,187
Education & Training 4,893,795 246,687
Support Care 99,692,883 4,167,526
Modified Home & Furniture 293,483 38,313
Orthopedic Equip. & Wheelchairs 4,624,214 221,408
Transportation Equipment 1,595,179 105,969
Personal Items 793,669 43,301
Medicine 189,332 17,644
Ancillary Services 3,991,172 120,873
 -------------- -------------
TOTAL 140,280,284 6,544,629
 
 
 [2]
 The court derived the $372,431 amount by taking Goffman's estimate of the amount of money that would have been expended on Danny's behalf during 1984, 1985 and 1986, which was "the amount which the plaintiff would have been out of pocket at the time of the judgment." Id. at 59. The court selected December 14, 1983, for Marino, Grossi-Halstead and Daniels, and May 16, 1983, for Wang because those were the dates on which the complaint and amended complaint were filed against the respective defendants
 
 
 [3]
 The federal rules modified the common law rule, which permits expert testimony only if "the subject matter of the expert testimony [is] 'beyond lay comprehension'...." S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 451 (3d ed. 1982)
 
 
 [4]
 Federal Rule of Evidence 704(a) provides in pertinent part: "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided." Fed.R.Evid. 704(a). Rule 704 was intended to abolish the common law rule against testimony regarding ultimate issues of fact. See Fed.R.Evid. 704 advisory committee notes
 
 
 [5]
 The cases cited by appellants for the proposition that testimony as to aggregate damages are impermissible under the federal rules--Matthews v. Ashland Chemical, 770 F.2d 1303, 1311 (5th Cir.1985), and Owen v. Kerr-McGee Corp., 698 F.2d 236 (5th Cir.1983),--are inapposite. In Matthews the Court of Appeals for the Fifth Circuit determined that the district court had properly precluded an expert from answering a question that called for legal conclusions about "whether Ashland's premises were ultrahazardous or unreasonably dangerous." Id. Similarly, the Fifth Circuit in Owen held that Rule 704 does not permit expert testimony as to legal conclusions. The court in Owen upheld a district court's ruling sustaining an objection to a question in which "the attorney was asking the witness to opine that Owen was contributorily negligent." Owen, 698 F.2d at 240
 
 
 [6]
 It may be that defendants' reading of Tenore is incorrect, and that Tenore only precludes expert testimony that relies on assumptions not already introduced into evidence or within the peculiar expertise of the expert. Under this reading of Tenore, the New Jersey rules and the federal rules do not conflict; the testimony here would be admissible because it relied upon the factual assertions of Forman, the rehabilitation expert, not on Goffman's assumptions. Moreover, as the district court aptly noted,
 [t]he figures in the tables were not net figures in the usual sense of the word. Rather they reflected the detailed manner in which the expert arrived at his conclusion, thus enabling defendants and the jury to evaluate, accept or reject each step. To prevent this data from going to a jury would be absurd. The concepts are somewhat complicated, and if the jury did not have the full rationale of the expert before it, there might well be speculative and uninformed verdicts based on hunch and guesswork rather than informed deliberation.
 J.A. at I-51.
 
 
 [7]
 In Walker v. Armco Steel Corp., 446 U.S. 740, 752, 100 S.Ct. 1978, 1986, 64 L.Ed.2d 659 (1980), the Court reaffirmed that where "there is no direct conflict between the Federal Rule and the state law, the Hanna analysis does not apply," and state law should control. See Oberst v. International Harvester Co., 640 F.2d 863, 867 n. 2 (7th Cir.1980) (Swygert, J., concurring in part and dissenting in part)
 
 
 [8]
 We note that state evidence rules may be applied in federal diversity cases by specific incorporation of state law in the Federal Rules of Evidence. See, e.g., Fed.R.Evid. 302, 501, 601. Indeed, Congress intervened in the development of the Rules largely because it determined that the proposed rules would intrude into areas of traditional state law, such as privileges. See O.G. Wellborn III, The Federal Rules of Evidence and the Application of State Law in the Federal Courts, 55 Tex.L.Rev. 371, 374 (1977); Burbank, The Rules Enabling Act of 1934, 130 U.Pa.L.Rev. 1015, 1187 (1982). In addition to privileges (Rule 501), Congress' intervention resulted in incorporation of state law in regard to competency of witnesses (Rule 601) and presumptions (Rule 302)
 Several courts have noted that the determination of whether a particular evidentiary ruling involves federal procedural law or state substantive law can be difficult. Thus, the Court of Appeals for the Seventh Circuit stated in In re Air Crash Disaster Near Chicago, Illinois, "[t]o the extent that the state evidentiary rule defines what is sought to be proved--here, the measure of damages--it may bind the federal court under Erie principles." 701 F.2d 1189, 1193 (7th Cir.) (applying the federal rules), cert. denied sub nom. Haider v. McDonnell Douglas Corp., 464 U.S. 866, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983).
 
 
 [9]
 Fed.R.Civ.P. 43(a), which has since been superseded by the Federal Rules of Evidence, provided "[a]ll evidence shall be admitted which is admissible ... under the rules of evidence applied in the court of general jurisdiction of the state in which the United States court is held." See C. Wright & A. Miller, 9 Federal Practice & Procedure Sec. 2401 (1971)
 
 
 [10]
 Defendants maintain that Huddell v. Levin, 537 F.2d 726, 742 (3d Cir.1976), held that the aggregate damages rule of Tenore is substantive and therefore is controlling here. Defendants, however, overlook the fact that Huddell explicitly held only one aspect of Tenore to be substantive: the admissibility of tax liability to determine the decedent's net income after taxes. 537 F.2d at 742
 Defendants nevertheless maintain that other language in Huddell, in which we referred to the Tenore aggregate damages rule, constitutes an implicit holding that rule is substantive. We disagree. Huddell discussed the Tenore holdings regarding inflation projections and presentation of aggregate damages and concluded that "[u]pon retrial the Tenore inflation rule and guidelines [regarding aggregate damages] will apply." 537 F.2d at 743. We find that Huddell is not controlling for two reasons. First, as the district court noted, Huddell is inapposite because the trial occurred prior to the effective date of the federal rules. The federal rules became effective in July of 1975. Although the new trial would have to have been held sometime after the filing of the amended opinion on June 23, 1976, the use of the federal rules, although permitted, was not mandated in all retrials. See Pub.L. 93-595, Sec. 1, 88 Stat. 1926 (1975). Thus, Huddell did not explicitly consider and need not have reached the question of whether the New Jersey aggregate damages rule is substantive or procedural. Second, nothing in the Huddell opinion indicates that the panel was faced with the decision whether to apply the Federal Rules or the Tenore rule. There is no evidence that the court was asked to consider, or considered sua sponte, the effect of the enactment of the Federal Rules of Evidence on the decision. Indeed, the relevant passage in Huddell has been cited as support for the proposition that a court need not express a view on a question not raised before it. See Martin Marietta Corp. v. New Jersey Nat'l Bank, 653 F.2d 779, 185 n. 1 (3d Cir.1981).
 
 
 [11]
 There is no evidence in the record that the district court gave a curative instruction, and the record on appeal does not indicate whether defendants' counsel moved for such an instruction. Plaintiff has not raised this issue on appeal
 
 
 [12]
 The court applied the 12% rate for the following periods: (1) as to Dr. Wang, the court assessed interest for the period from May 16, 1983 (the filing date of the complaint against Wang) to October 6, 1986 (the judgment date); (2) as to Dr. Marino, and Nurses Grossi-Halstead, and Daniels, the court assessed interest for the period from December 14, 1983 (the filing date of the complaint against these defendants) to October 6, 1986
 
 
 [13]
 The district court correctly determined that, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it should apply the New Jersey prejudgment interest rule in this diversity action. See Huddell v. Levin, 395 F.Supp. 64, 94 (D.N.J.1975) ("under the Erie doctrine, a federal court must apply prejudgment interest to any award in a diversity case where New Jersey substantive law as to damages is applicable"), vacated on other grounds, 537 F.2d 726 (3d Cir.1976); see also Jarvis v. Johnson, 668 F.2d 740, 741 (3d Cir.1982) (Pennsylvania prejudgment interest rule applicable in federal diversity action)
 
 
 [14]
 The most recent amendment, effective January 1, 1988, provides for a variable rate equal to the rate of return on the State of New Jersey Cash Management Fund for all interest accruing after January 1, 1988, but does not disturb the 12% prejudgment interest rate for interest that accrued before the effective date. Amendment of November 2, 1987
 
 
 [15]
 In Busik, 307 A.2d at 576, the New Jersey Supreme Court rejected the notion that prejudgment interest awards are duplicative:
 We see no strength in the assertion that the allowance of interest duplicates some element of damage or constitutes a payment with respect to damages not yet experienced. The jury is not instructed to add interest to its verdict in tort cases. In any event an instruction to the jury can obviate the risk. And with respect to the criticism that a verdict may embrace losses not yet suffered, the answer is that a verdict necessarily anticipates future experience, and the interest factor simply covers the value of the award for the period during which the defendants had the use of the moneys to which plaintiffs are found to be entitled. We think the equities are met when the date for the commencement of liability for interest is fixed as set forth in paragraph (b) of R. 4:42-11 (the rule here under attack).
 
 
 [16]
 Defendant Marino maintains that Ruff is distinguishable because, whereas the plaintiff's future losses in Ruff were discounted to the date of the injury, Goffman's projections were discounted down to the time of trial in October, 1986, not to July 30, 1978, the date of the injury. Marino Reply Br. at 7. The court in Ruff determined that prejudgment interest on pre- and postjudgment damages was appropriate, but recognized that a "significant" question was presented by the application of the law to damages for future losses. 105 N.J. at 246 n. 6, 519 A.2d 1384 (citing Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 538 n. 22, 103 S.Ct. 2541, 2551 n. 22, 76 L.Ed.2d 768 (1983) (suggesting that the best way to determine damages is to determine total loss from time of injury, and to provide interest from the period extending from the time of injury to the time of judgment); In re Air Crash Disaster Near Chicago, Illinois, 644 F.2d 633, 641-46 (7th Cir.1981)). However, we read Ruff to indicate that even where the testimony as to damages is discounted to the date of trial, no "exceptional case" arises simply because the majority of damages will arise in the future
 
 
 [17]
 We of course intimate no view on this question, as there is nothing in the record on the matter
 
 
 [18]
 Because we will remand the prejudgment interest question for a hearing, we do not reach defendants' argument that Rule 4.42-11(b) violates due process because it erects "a barrier to access to the courts" and penalizes defendants who decide to try rather than to settle a case. However, it is instructive to note that the defendants present a significant constitutional challenge to the Rule, one which led the Pennsylvania Supreme Court to suspend an analogous rule. See Craig v. Magee Memorial Rehabilitation Center, 512 Pa. 60, 515 A.2d 1350 (1986) (Pennsylvania prejudgment interest rule suspended for lack of hearing provision to determine the party causing delay)
 The second "exceptional case" policy justification outlined in Ruff is to punish delay and encourage settlements. To the extent that an award of prejudgment interest is supported by the rationale of punishing delay, due process would seem to require that, before interest could be awarded, defendants be provided an opportunity to demonstrate that they are not responsible for the delay.